# COVER SHEET
## Civil Case Filing Form
*(To be completed by Attorney/Party Prior to Filing of Pleading)*

Mississippi Supreme Court     Form AOC/01
Administrative Office of Courts     (Rev 2009)

| Court Identification Docket # | Case Year | Docket Number |
|---|---|---|
| Z S 1   C I | 2 0 1 6 | 3 1 S |

County #   Judicial District   Court ID (CH, CI, CO)

Z S 1   C I

Month Date Year: 0 5 3 1 1 6

This area to be completed by clerk

Case Number if filed prior to 1/1/94

In the CIRCUIT     Court of HINDS     County — FIRST     Judicial District

## Origin of Suit (Place an "X" in one box only)
[X] Initial Filing   [ ] Reinstated   [ ] Foreign Judgment Enrolled   [ ] Transfer from Other court   [ ] Other
[ ] Remanded   [ ] Reopened   [ ] Joining Suit/Action   [ ] Appeal

## Plaintiff - Party(ies) Initially Bringing Suit Should Be Entered First - Enter Additional Plaintiffs on Separate Form
Individual

Last Name   First Name   Maiden Name, if applicable   M.I.   Jr/Sr/III/IV

Check ( x ) if Individual Plaintiff is acting in capacity as Executor(trix) or Administrator(trix) of an Estate, and enter style:
Estate of

Check ( x ) if Individual Plaintiff is acting in capacity as Business Owner/Operator (d/b/a) or State Agency, and enter entity
D/B/A or Agency

Business M.A.C. & Associates, LLC
Enter legal name of business, corporation, partnership, agency - If Corporation, indicate the state where incorporated
Check ( x ) if Business Plaintiff is filing suit in the name of an entity other than the above, and enter below:
D/B/A

Address of Plaintiff   125 South Congress Sqreet, Suite 1300, Jackson, MS 39201

Attorney (Name & Address)   Robert L. Gibbs, 1400 Meadowbrook Road,Suite 100, Jackson, MS 39211     MS Bar No. 4816
Check ( x ) if Individual Filing Initial Pleading is NOT an attorney
Signature of Individual Filing:

## Defendant - Name of Defendant - Enter Additional Defendants on Separate Form
Individual

Last Name   First Name   Maiden Name, if applicable   M.I.   Jr/Sr/III/IV

Check ( x ) if Individual Defendant is acting in capacity as Executor(trix) or Administrator(trix) of an Estate, and enter style:
Estate of

Check ( x ) if Individual Defendant is acting in capacity as Business Owner/Operator (d/b/a) or State Agency, and enter entity:
D/B/A or Agency

Business Siemens Industry, Inc.
Enter legal name of business, corporation, partnership, agency - If Corporation, indicate the state where incorporated
Check ( x ) if Business Defendant is acting in the name of an entity other than the above, and enter below:
D/B/A

Attorney (Name & Address) - If Known     MS Bar No.

## Damages Sought:
Compensatory $ 12,000,000.0   Punitive $ 25,000,000.0   Check ( x ) if child support is contemplated as an issue in this suit.*
*If checked, please submit completed Child Support Information Sheet with this Cover Sheet

## Nature of Suit (Place an "X" in one box only)

### Domestic Relations
[ ] Child Custody/Visitation
[ ] Child Support
[ ] Contempt
[ ] Divorce:Fault
[ ] Divorce: Irreconcilable Diff.
[ ] Domestic Abuse
[ ] Emancipation
[ ] Modification
[ ] Paternity
[ ] Property Division
[ ] Separate Maintenance
[ ] Termination of Parental Rights
[ ] UIFSA (eff 7/1/97; formerly URESA)
[ ] Other

### Appeals
[ ] Administrative Agency
[ ] County Court
[ ] Hardship Petition (Driver License)
[ ] Justice Court
[ ] MS Dept Employment Security
[ ] Worker's Compensation
[ ] Other

### Business/Commercial
[ ] Accounting (Business)
[ ] Business Dissolution
[ ] Debt Collection
[ ] Employment
[ ] Foreign Judgment
[ ] Garnishment
[ ] Replevin
[ ] Other

### Probate
[ ] Accounting (Probate)
[ ] Birth Certificate Correction
[ ] Commitment
[ ] Conservatorship
[ ] Guardianship
[ ] Heirship
[ ] Intestate Estate
[ ] Minor's Settlement
[ ] Muniment of Title
[ ] Name Change
[ ] Testate Estate
[ ] Will Contest
[ ] Other

### Children/Minors - Non-Domestic
[ ] Adoption - Contested
[ ] Adoption - Uncontested
[ ] Consent to Abortion Minor
[ ] Removal of Minority
[ ] Other

### Civil Rights
[ ] Elections
[ ] Expungement
[ ] Habeas Corpus
[ ] Post Conviction Relief/Prisoner
[ ] Other

### Contract
[ ] Breach of Contract
[ ] Installment Contract
[ ] Insurance
[ ] Specific Performance
[X] Other Fraud/Breach/Negl

### Statutes/Rules
[ ] Bond Validation
[ ] Civil Forfeiture
[ ] Declaratory Judgment
[ ] Injunction or Restraining Order

### Real Property
[ ] Adverse Possession
[ ] Ejectment
[ ] Eminent Domain
[ ] Eviction
[ ] Judicial Foreclosure
[ ] Lien Assertion
[ ] Partition
[ ] Tax Sale: Confirm/Cancel
[ ] Title Boundary or Easement
[ ] Other

### Torts
[ ] Bad Faith
[ ] Fraud
[ ] Loss of Consortium
[ ] Malpractice - Legal
[ ] Malpractice - Medical
[ ] Mass Tort
[ ] Negligence - General
[ ] Negligence - Motor Vehicle
[ ] Product Liability
[ ] Subrogation
[ ] Wrongful Death
[ ] Other

**A**

Case: 25CI1:16-cv-00315-TTG      Document #: 2-1      Filed: 05/31/2016      Page 2 of 2

## COVER SHEET
### Civil Case Filing Form
*(To be completed by Attorney/Party Prior to Filing of Pleading)*

Mississippi Supreme Court            Form AOC/01
Administrative Office of Courts         (Rev 2009)

| Court Identification Docket # | | | Case Year | Docket Number |
|---|---|---|---|---|
| County # | Judicial District | Court ID (CH, CI, CO) | | |
| | | | | Local Docket ID |

| Month | Date | Year |
|---|---|---|

This area to be completed by clerk

Case Number if filed prior to 1/1/94

In the CIRCUIT     Court of   HINDS     County —   FIRST     Judicial District

**Origin of Suit (Place an "X" in one box only)**

[X] Initial Filing     [ ] Reinstated     [ ] Foreign Judgment Enrolled     [ ] Transfer from Other court     [ ] Other
[ ] Remanded     [ ] Reopened     [ ] Joining Suit/Action     [ ] Appeal

**Plaintiff - Party(ies) Initially Bringing Suit Should Be Entered First - Enter Additional Plaintiffs on Separate Form**

Individual
_____     _____     _____     M.I.   Jr/Sr/III/IV
        Last Name                           First Name                    Maiden Name, if applicable

____ Check ( x ) if Individual Plaintiff is acting in capacity as Executor(trix) or Administrator(trix) of an Estate, and enter style:
        Estate of _____

____ Check ( x ) if Individual Plaintiff is acting in capacity as Business Owner/Operator (d/b/a) or State Agency, and enter entity
        D/B/A or Agency _____

Business  M.A.C. & Associates, LLC
        Enter legal name of business, corporation, partnership, agency - If Corporation, indicate the state where incorporated
____ Check ( x ) if Business Plaintiff is filing suit in the name of an entity other than the above, and enter below:
        D/B/A _____

Address of Plaintiff   125 South Congress Sqreet, Suite 1300, Jackson, MS 39201

Attorney (Name & Address)  Robert L. Gibbs, 1400 Meadowbrook Road Suite 100, Jackson, MS 39211     MS Bar No.  4816
____ Check ( x ) if Individual Filing Initial Pleading is NOT an attorney
Signature of Individual Filing: _____

**Defendant - Name of Defendant - Enter Additional Defendants on Separate Form**

Individual
_____     _____     _____     M.I.   Jr/Sr/III/IV
        Last Name                           First Name                    Maiden Name, if applicable

____ Check ( x ) if Individual Defendant is acting in capacity as Executor(trix) or Administrator(trix) of an Estate, and enter style:
        Estate of _____

____ Check ( x ) if Individual Defendant is acting in capacity as Business Owner/Operator (d/b/a) or State Agency, and enter entity:
        D/B/A or Agency _____

Business  Siemens Industry, Inc.
        Enter legal name of business, corporation, partnership, agency - If Corporation, indicate the state where incorporated
____ Check ( x ) if Business Defendant is acting in the name of an entity other than the above, and enter below:
        D/B/A _____

Attorney (Name & Address) - If Known _____     MS Bar No. _____

**Damages Sought:**   Compensatory $ 12,000,000.0      Punitive $  25,000,000.0      Check ( x ) if child support is contemplated as an issue in this suit.*
                                                        *If checked, please submit completed Child Support Information Sheet with this Cover Sheet

**Nature of Suit (Place an "X" in one box only)**

| Domestic Relations | Business/Commercial | Children/Minors - Non-Domestic | Real Property |
|---|---|---|---|
| [ ] Child Custody/Visitation | [ ] Accounting (Business) | [ ] Adoption - Contested | [ ] Adverse Possession |
| [ ] Child Support | [ ] Business Dissolution | [ ] Adoption - Uncontested | [ ] Ejectment |
| [ ] Contempt | [ ] Debt Collection | [ ] Consent to Abortion Minor | [ ] Eminent Domain |
| [ ] Divorce:Fault | [ ] Employment | [ ] Removal of Minority | [ ] Eviction |
| [ ] Divorce: Irreconcilable Diff. | [ ] Foreign Judgment | [ ] Other | [ ] Judicial Foreclosure |
| [ ] Domestic Abuse | [ ] Garnishment | **Civil Rights** | [ ] Lien Assertion |
| [ ] Emancipation | [ ] Replevin | [ ] Elections | [ ] Partition |
| [ ] Modification | [ ] Other | [ ] Expungement | [ ] Tax Sale: Confirm/Cancel |
| [ ] Paternity | **Probate** | [ ] Habeas Corpus | [ ] Title Boundary or Easement |
| [ ] Property Division | [ ] Accounting (Probate) | [ ] Post Conviction Relief/Prisoner | [ ] Other |
| [ ] Separate Maintenance | [ ] Birth Certificate Correction | [ ] Other | **Torts** |
| [ ] Termination of Parental Rights | [ ] Commitment | **Contract** | [ ] Bad Faith |
| [ ] UIFSA (eff 7/1/97; formerly URESA) | [ ] Conservatorship | [ ] Breach of Contract | [ ] Fraud |
| [ ] Other | [ ] Guardianship | [ ] Installment Contract | [ ] Loss of Consortium |
| **Appeals** | [ ] Heirship | [ ] Insurance | [ ] Malpractice - Legal |
| [ ] Administrative Agency | [ ] Intestate Estate | [ ] Specific Performance | [ ] Malpractice - Medical |
| [ ] County Court | [ ] Minor's Settlement | [X] Other  Fraud/Breach/Negl | [ ] Mass Tort |
| [ ] Hardship Petition (Driver License) | [ ] Muniment of Title | **Statutes/Rules** | [ ] Negligence - General |
| [ ] Justice Court | [ ] Name Change | [ ] Bond Validation | [ ] Negligence - Motor Vehicle |
| [ ] MS Dept Employment Security | [ ] Testate Estate | [ ] Civil Forfeiture | [ ] Product Liability |
| [ ] Worker's Compensation | [ ] Will Contest | [ ] Declaratory Judgment | [ ] Subrogation |
| [ ] Other | [ ] Other | [ ] Injunction or Restraining Order | [ ] Wrongful Death |
| | | [ ] Other | [ ] Other |

**IN THE CIRCUIT COURT OF THE FIRST JUDICIAL DISTRICT OF HINDS COUNTY, MISSISSIPPI**

FILED
MAY 31 2016
ZACK WALLACE
BY _____ PLAINTIFF CIRCUIT CLERK
_____ D.C.

M.A.C. & ASSOCIATES, LLC

**PLAINTIFF**

VS.

CIVIL ACTION NO. 16-315

SIEMENS INDUSTRY, INC.
and JOHN DOES 1-3

**DEFENDANT**

## COMPLAINT

COMES NOW Plaintiff, M.A.C. & Associates, LLC, by and through counsel, and files this Complaint against Defendant, Siemens Industry, Inc. ("Siemens" or "Defendant").   In support thereof, Plaintiff would show unto this Honorable Court the following:

## PARTIES

1.      Plaintiff, M.A.C. & Associates, LLC is a minority owned business, located in Jackson, Mississippi.

2.      Defendant, Siemens Industry, Inc. is a company registered to do business within the State of Mississippi, located at 1919 Lakeland Drive, Jackson, Mississippi 39216 and may be served with process through its registered agent for service of process, CT Corporation System, 645 Lakeland Drive East, Suite 101, Flowood, Mississippi 39232.

3.      Defendants John Does 1-3 are other individuals or corporations who may be liable for all or part of the negligible acts or omissions committed resulting in the injury to M.A.C. & Associates, LLC and for whom Plaintiff may seek recovery of damages, but whose identity is unknown at this time.

## JURISDICTION AND VENUE

4.      Pursuant to Mississippi Code Annotated § 9-7-81 (2006), this Court has original subject matter and personal jurisdiction over Defendant.

5.      Pursuant to Mississippi Code Annotated § 11-11-3 (2006), venue is proper in the Circuit Court of Hinds County, Mississippi in that the events that caused the injury occurred in Jackson, Mississippi (Hinds County).

## FACTUAL BACKGROUND

6.      In January 2013, the City of Jackson entered into a contract with Siemens Industry, Inc. (hereinafter "Siemens" or "Defendant") to make improvements to the City's water and sewer system.   Siemen's scope under the contract consisted of (1) Advance Metering Infrastructure Upgrade; (2) Water Treatment Plant Repairs and Upgrades; and (3) Sewer Collection System Repairs.   The total cost of these projects to the City was $90,983,106 with additional payments due to Siemens for the Performance Assurance Program Services.

7.      The Advance Metering Infrastructure Upgrade was the largest component of the contract and consists of the installation of almost 65,000 remote read meters; the infrastructure necessary to collect data from the remote read meters, and a new billing system.   The total cost of the Advance Metering Infrastructure Upgrade is $51,209,884,

8.      In order to secure the instant contract, Defendant committed to the City of Jackson that (1) 50% of the project cost would be in compliance with the City's EBO program, (2) it would partner with Jobs for Jacksonians and Youth Summer Work Program, (3) it would have internships with Jackson State University School of Science, Engineering, and Technology; (4) all material purchases would be made from Jackson's distributors, and (5) it would move its office within the City limits of Jackson.

9.      In September 2012, Siemens made application to the City of Jackson Equal Business Opportunity Plan (EBO).   In its application, Siemens proposed that 58.29% of the construction on the project would be African-American and 32% would be female.   To help

2

reach these goas, Siemens selected M.A.C. & Associates, LLC "hereinafter "M.A.C. or "Plaintiff") to perform construction, sewer repair work, O&M work and water meter installation work, digging and plumbing with a dollar value of $20,328,920.00 and a 21.9% minority business enterprise participation.

10.    Prior to the City accepting Siemens' proposal, Siemens committed to the City that it would mentor, train and manage local minority businesses involved in the project, which included Plaintiff.

11.    Siemens also committed to M.A.C. and other minority businesses, that was a part of Siemens' Equal Business Opportunity ("EBO") proposal to the City, that it would mentor, train and help manage these businesses so these businesses would be successful and able to compete for similar contracts in the future.

12.    Based, in part, on representations made by Siemens, Plaintiff, by and through its President, Marcus Wallace lobbied the City's leadership and in January 2013 the City of Jackson and Siemens entered into a contract to make improvements to the City's water and sewer systems.

13.    Siemens and M.A.C. entered into negotiations for M.A.C. to be a subcontractor to handle the construction part of the City's contract with Siemens. In its attempts to negotiate a fair contract, M.A.C. submitted price proposals which would allow him the standard 15-20% markup on phases of work. Siemens refused to allow M.A.C. to receive this type of profit and would only agree to a low 5% profit. Siemens represented to M.A.C. that there was not enough profit in Siemens's Contract with the City to allow M.A.C. to make a 15-20% mark-up.

14.    In July 2013, Siemens and M.A.C. entered into a Subcontract Agreement wherein Siemens was the contractor and M.A.C. being the subcontractor. A copy of the Subcontract

3

Agreement is attached hereto as Exhibit "1" and is made a part of this Complaint as if it was fully contained herein.

15.    To carry out M.A.C. Subcontract Agreement with Siemens, M.A.C. contracted with Hemphill Construction, Inc. (hereinafter "Hemphill") to assist in performing the O&M and sewer repair work.  Siemens recommended to M.A.C. that it should contract with Pedal Valve, Inc. (hereinafter "Pedal") to assist in performing the water meter phase of the project.  Based on Siemens' recommendation, M.A.C. met with Pedal and Pedal committed to assist in the water meter phase.

16.    After the City gave the notice to proceed on this project, Siemens entered into a separate Subcontract Agreement with Pedal.  Siemens subcontract with Pedal breached Siemens subcontract with M.A.C. who was no longer responsible for all construction work on the subject project and also reduced the amount of minority participation that Siemens contract with the City required.

17.    Pedal's removal from a subcontract with M.A.C. caused substantial harm to M.A.C. as follows:

    a.    M.A.C. no longer had control of a significant part of the construction phase of the subject project in breach of its contract with Siemens;

    b.    Siemens removed the contingency portion of the construction phase of the contract from M.A.C. and gave it to Pedal;

    c.    Pedal, as a subcontractor to Siemens, looked out for its best interest to the detriment of M.A.C. by hiring employees of M.A.C. who had been trained at M.A.C.'s expense;

    d.    Pedal failed to keep a sufficient number of professional installers ("Eagles") on the City of Jackson project, leaving unskilled local workers to work in Jackson.  This resulted in M.A.C.'s production numbers going down;

4

e.    Pedal's "Eagles" failed to properly install meters which caused M.A.C.'s installers to return to make a proper installation. In that Pedal had been paid for the installation, M.A.C was not able to charge for the repair charges, thus causing M.A.C. to loss money;

f.    Pedal, without M.A.C.'s knowledge or consent, sent M.A.C. employees to other towns/cities where Pedal had contracts to work on other water meter projects at M.A.C.'s expense; and

g.    Pedal made promises to the City to perform miscellaneous work on the subject project, but MAC ended up performing said work. The contingency fund was set up to pay for this work but Siemens allowed Pedal to use the contingency fund which resulted in MAC not being paid.

18.    Siemens failed to carry out its part of the contract with the City which resulted in the City shutting down the project twice. M.A.C. suffered serious financial loss during these shutdowns.

19.    As a result of the act(s) and/or omissions of Siemens, M.A.C. has sustained economic and punitive damages.

## FRAUDULENT MISREPRESENTATION

20.    Plaintiff re-allege and incorporate herein the foregoing allegations of this Complaint as if set forth herein in its entirety.

21.    Defendant made material and/or significant factual representations to the City of Jackson which Plaintiff relied on which representations were false. Those factual representations are as follow:

a.    That 58.29% of the water meter project would go to African American businesses;

b.    That 21.9% of the contract would be awarded to M.A.C. and that the dollar value of the work to be performed by M.A.C. would be $23,328,920.00;

c.    That M.A.C. would be responsible for all construction phases of the contract;

    d.    That every minority subcontractor, including M.A.C., would be properly mentored, trained and managed since this project was new and unique; and

    e.    That Defendant would utilize the City of Jackson's Job for Jacksonians program and the Second Chance Program and that subcontractors, including M.A.C., would also utilize these programs.

22.    Plaintiff relied on these representations not knowing they were not true.

23.    The representations made to the City of Jackson and Plaintiff were false and amounts to misrepresentations.

24.    Plaintiff reasonably relied on these misrepresentations to its detriment.

25.    The acts and/or omission of Defendant proximately caused or contributed to damages and losses incurred by Plaintiff.

## FRAUD BY THE INDUCEMENT

26.    Plaintiff re-allege and incorporate herein the foregoing allegations of this Complaint as if set forth herein in its entirety.

27.    Defendant, in seeking to obtain the subject contract from the City of Jackson, made certain statements and representations to the City and Plaintiff, which lead Plaintiff to be a part of Defendant's EBO team presented to the City.  Defendant represented to the City:

    a.    That Plaintiff would perform all construction, sewer repair, O&M work and water meter installations on the project;

    b.    Plaintiff's participation in the project would be 21.9% of the cost of the project; and

    c.    Defendant would train, manage and mentor its EBO team, including Plaintiff, so the local and minority companies, including Plaintiff, would come out of the project profitable.

28.    Plaintiff as a local minority company, reasonably relied on these representations and allowed Defendant to include it as a part of Defendant's EBO team.

29.    Plaintiff as a local minority company reasonable relied on these representations

when it entered into a Subcontract Agreement with Defendant.

30.     Defendant intentionally and without just cause engaged in deceitful business practices, which fraudulently induced Plaintiff to be a part of Defendant's EBO team and to sign the Subcontract Agreement with Plaintiff.

31.     These fraudulent acts were calculated to harm Plaintiff and as a direct and/or proximate cause thereof Plaintiff has been irreparably harmed.

### BREACH OF CONTRACT

32.     Plaintiff re-allege and incorporate herein the foregoing allegations of this Complaint as if set forth herein in its entirety.

33.     Plaintiff and Defendant entered into a Subcontract Agreement July 2013 for Plaintiff to perform certain construction work as described in Exhibit "A" to the subject Subcontract Agreement. (Exhibit "1" attached hereto.) Rather than allowing Plaintiff to perform the work described in Exhibit "A" of the Subcontract Agreement, Defendant breached the Subcontract Agreement in the following matters:

   a.     Removed meter installation from M.A.C.'s Subcontract Agreement with Siemens and entering into a separate Subcontract Agreement with Pedal for meter installation;

   b.     Failure to pay Plaintiff's the standard markup percentage for the value of services rendered in order for Defendant to receive a larger profit share;

   c.     Caused Plaintiff to perform work for which it was not paid;

   d.     Did not pay Plaintiff the full value of work performed;

   e.     Reduced M.A.C.'s subcontract by $983,347.60 with a change order that was not agreed to by M.A.C; and

   f.     Failure to pay the amount due under the contract.

## BREACH OF IMPLIED DUTY OF GOOD FAITH AND FAIR DEALINGS

34.    Plaintiff re-allege and incorporate herein the foregoing allegations of this Complaint as if set forth herein in its entirety.

35.    Every contract in Mississippi carry an implied duty of good faith and fair dealing. These covenants provide that both sides to a contract will act in good faith and not prevent the opposing side from realizing the benefit of their bargain.

36.    Defendant breached the implied covenant by (1) removing Pedal as a subcontractor to M.A.C., (2) removing the contingency funds from M.A.C., (3) not paying M.A.C. the full value of its work, (4) reducing the amount due M.A.C. with a change order that was not agreed to by M.A.C., and (5) not paying M.A.C. for work performed by M.A.C.

## NEGLIGENCE

37.    Plaintiff re-allege and incorporate herein the foregoing allegations of this Complaint as if set forth herein in its entirety.

38.    Defendant owes Plaintiff a duty to:

    a.    Comply with its representations made to the City of Jackson and to Plaintiff;

    b.    Comply with the contract terms;

    c.    Act with due care toward its subcontractors, including Plaintiff;

    d.    Comply with the Equal Business Opportunity (EBO) Program of the City of Jackson; and

    e.    Provide training and mentoring to its subcontactors, including M.A.C.

39.    Defendant breached its duty owed to Plaintiff.

40.    Defendant's breach, directly and/or proximately caused Plaintiff's damages.

8

## GROSS NEGLIGENCE

41.    Plaintiff re-allege and incorporate herein the foregoing allegations of this Complaint as if set forth herein in its entirety.

42.    Defendant owes Plaintiff a duty to Plaintiff to:

    a.    Comply with its representations made to the City of Jackson and to Plaintiff;

    b.    Comply with the contract terms;

    c.    Act with due care toward its subcontractors, including Plaintiff;

    d.    Comply with the Equal Business Opportunity (EBO) Program of the City of Jackson; and

    e.    Provide training and mentoring to its subcontactors, including M.A.C. wholly and completely.

43.    Defendant intentionally, maliciously and callously breached its duty owed to Plaintiff.

44.    Defendant's breach, directly and/or proximately caused Plaintiff's damages.

## INTERFERENCE WITH BUSINESS RELATIONS

43.    Plaintiff re-allege and incorporate herein the foregoing allegations of this Complaint as if set forth herein in its entirety.

44.    Defendant interfered with Plaintiff business relations with Pedal by removing Pedal as a subcontractor to Plaintiff and executing a separate subcontract with Pedal and removing contingency funds from Plaintiff to Pedal.

45.    Defendant interfered with Plaintiff business with Hemphill Construction by dealing directly with Hemphill who was a subcontractor of M.A.C.

46.    Defendant, in cooperation with Hemphill interfered with Plaintiff's banking relationship with Copiah Bank, by preventing Plaintiff access to funds deposited into his

account.

47.     These acts of interference directly and/or proximately caused damages to Plaintiff.

## PUNITIVE DAMAGES

48.     Plaintiff re-allege and incorporate herein the foregoing allegations of this Complaint as if set forth herein in its entirety.

49.     The aforementioned actions of Defendant were done knowingly, willfully and intentionally or with reckless disregard for the rights of Plaintiff, evidencing bad faith on the part of Defendant and entitling Plaintiff to punitive damages.

## PRAYER FOR RELIEF

WHEREFORE PREMISES CONSIDERED, Plaintiff prays that summon is issued against Defendant and that Defendant be cited to appear and answer herein, that on final hearing hereof, Plaintiff have judgment entered against Defendant in the amount of $12,000,000.00, in actual damages and in the amount of $25,000,000.00 in punitive damages, plus reasonable attorneys' fees and all costs of Court incurred herein.

Respectfully submitted,

**M.A.C. AND ASSOCIATES, LLC.**

Robert L. Gibbs

OF COUNSEL:
Robert L. Gibbs, MSB No. 4816
Tujuana S. McGee, MSB No. 104263
Gibbs Travis PLLC
1400 Meadowbrook Road, Suite 100
Jackson, Mississippi 39211
Telephone: 601-487-2631
Facsimile:  601-366-4295

# SIEMENS INDUSTRY, INC., BUILDING TECHNOLOGIES DIVISION

SUBCONTRACT AGREEMENT NUMBER                     PO # 4503813170

| THIS **AGREEMENT** is made this ____ day of ____, ____, by and between Siemens Industry, Inc., Building Technologies Division ("CONTRACTOR") and the party identified below as SUBCONTRACTOR and effective as of the ____ day of ____ |
|---|

| CUSTOMER NAME: CITY OF JACKSON MS | PROJECT: CITY OF JACKSON WATER       No. 44op-130368 |
|---|---|
| SUBCONTRACTOR NAME AND ADDRESS:<br>M.A.C. and Associates , LLC<br>125 S. Congress Street Suite 1600 B<br>Jackson MS, 39201<br><br>DESIGNATED REPRESENTATIVE: Marcus Wallace<br>PHONE:  601-321-9731 FAX: 601-321-9755 | SIEMENS INDUSTRY, INC., BUILDING TECHNOLOGIES DIVISION (CONTRACTOR)<br>1018 North Flowood<br>Flowood MS<br>39232<br><br>DESIGNATED REPRESENTATIVE: Mark Inbody<br>PHONE:  512-535-8405 FAX: 512-339-3617 |

| AGREEMENT TERMS |
|---|

**ARTICLE 1: ENGAGEMENT:**

1.1     CONTRACTOR hereby engages and SUBCONTRACTOR hereby accepts the engagement to perform and provide the Work set forth in Exhibit A hereof and incorporated herein, in connection with the Project and in accordance with the terms and conditions of this Subcontract.

1.2     SUBCONTRACTOR shall perform the Work as an independent contractor with exclusive control of the manner and means of performing the Work in accordance with the requirements of this Subcontract. SUBCONTRACTOR has no authority to act or make any agreements or representations on behalf of CONTRACTOR or the Customer, and no contractual relationship exists between SUBCONTRACTOR and the Customer. This Subcontract is not intended, and shall not be construed to create, between CONTRACTOR and SUBCONTRACTOR, the relationship of principal and agent, joint venturers, co-partners or any other such relationship, the existence of which is hereby expressly denied. No employee or agent engaged by SUBCONTRACTOR shall be, or shall be deemed to be, an employee or agent of CONTRACTOR.

1.3     This Subcontract shall be construed and governed by the laws of the State of Mississippi. SUBCONTRACTOR represents that it is duly authorized to do business in all locations where the Work is to be performed, it has the knowledge, license, certification, capability and expertise to act as the SUBCONTRACTOR and will evidence said authorization, license, certification and capability to CONTRACTOR upon request.

1.4     Prior to commencement of the Work, SUBCONTRACTOR shall provide, and maintain in full force and effect during the term of this Subcontract, the insurance coverage upon SUBCONTRACTOR's operations hereunder as specified in the Exhibit E, plus such other insurance coverage as CONTRACTOR may require. SUBCONTRACTOR shall not be allowed on the Project or to commence the Work until the original insurance certificates required by Exhibit E have been furnished to CONTRACTOR.

**ARTICLE 2: TIME OF PERFORMANCE:**

2.1     SUBCONTRACTOR shall prosecute and complete all Work under the Subcontract in accordance with the schedule in Exhibit A.

**ARTICLE 3: COMPENSATION/TERMS OF PAYMENT:**

3.1     As full consideration for the complete, satisfactory and timely performance by SUBCONTRACTOR of the Work contemplated by this Subcontract in strict accordance with the requirements hereof, CONTRACTOR shall pay to SUBCONTRACTOR $ 20,328,920.00 as agreed upon in Exhibit B and in accordance with the payment terms and conditions established by the Subcontract Documents.

**ARTICLE 4: SUBCONTRACT DOCUMENTS:**

4.1     This Subcontract shall consist of the following documents ("Subcontract Documents") which are acknowledged by SUBCONTRACTOR and incorporated herein by this reference:

- ☒ SCOPE OF SERVICES EXHIBIT A
- ☒ COMPENSATION/PAYMENT EXHIBIT B
- ☒ SUPPLEMENTARY CONDITIONS EXHIBIT C
- ☒ GENERAL CONDITIONS EXHIBIT D
- ☒ INSURANCE REQUIREMENTS EXHIBIT E
- ☒ GENERAL SAFETY RULES EXHIBIT F
- ☒ WIRING PRODUCTS LIST EXHIBIT G
- ☒ OTHER DOCUMENTS LIST EXHIBIT H

4.2     This Subcontract is subject to each of the drawings, specifications, addenda, terms and conditions contained or incorporated in the Contract between CONTRACTOR and the Customer (the "Contract") which are hereby incorporated by reference excluding only such terms and conditions which by ordinary and reasonable rules of construction are not applicable to the portion of the Project performed by the SUBCONTRACTOR. Except where it clearly appears from a careful reading of an individual clause that the Customer has a particular and direct interest in this Subcontract, SUBCONTRACTOR agrees to be bound thereby in the same manner as if SUBCONTRACTOR were the named "Contractor" (or such other equivalent term as used therein) in the Contract and CONTRACTOR were the "Customer" (or such equivalent term as used therein) and the word "SUBCONTRACTOR" therein were the lower-tier subcontractor of SUBCONTRACTOR.

4.3     The documents referenced in sections 4.1 and 4.2 constitute the entire Subcontract between CONTRACTOR and SUBCONTRACTOR and supersede all prior and contemporaneous negotiations, statements, representations, agreements, letters of intent, awards, or proposals, either written or oral. This Subcontract may be modified only by a written instrument signed by both parties.

4.4     In the event of any inconsistency between the provisions of the Subcontract Documents, the inconsistency shall be resolved by giving precedence in the order listed below.

    4.4.1 Subcontract Agreement
    4.4.2 Exhibit C, Supplementary Conditions
    4.4.3 Exhibit D, General Conditions
    4.4.4 Exhibit A, Scope of Work and Schedule of Services, including Attachments
    4.4.5 Exhibit B, Compensation/Payment
    4.4.6 Exhibit "H"

4.5     The Effective Date set forth on this page of this Subcontract shall be the date as which all Subcontract Documents and provisions thereof have reference for purposes of coordination of their meaning and effect. The price relates to the Work as described in the Contract Document in their condition on that date. Changes after the Effective Date will be dealt with in accordance with the provisions for changes. Any work commenced and any payments made pursuant to an Award or Letter of Intent shall be deemed to have been done and paid after the Effective Date and under the terms of this Subcontract.

| Performance & Payment Bonds (Exhibit C)    Yes: ☒   No: ☐<br>Certified Payroll Required (Exhibit C)    Yes: ☒   No: ☐ | TOTAL PAGES ATTACHED (INCLUDING EXHIBITS): _____ |
|---|---|
| AGREED ON BEHALF OF SUBCONTRACTOR: | AGREED ON BEHALF OF SIEMENS INDUSTRY, INC. : |
| SIGNATURE:                          DATE: 7/9/13 | SIGNATURE:                          DATE: 7/20/12 |
| PRINT NAME & TITLE:  MARCUS L WALLACE, PRESIDENT | PRINT NAME & TITLE: MARK E INBODY |

Document Number: C05_99_FM0055
Version: 1.1

FORM S-100
S-100 Subcontract Agreement For
Department: Legal

Published Date: 03/29/2013
Contract Page 1 of 17



EXHIBIT
1

# SIEMENS INDUSTRY, INC., BUILDING TECHNOLOGIES DIVISION

SUBCONTRACT AGREEMENT NUMBER

## SCOPE OF WORK & SCHEDULE OF SERVICES – EXHIBIT A

### Article 1: SCOPE OF WORK

1.1    *Project:* CITY OF JACKSON WATER

1.2    *Description:* Except as otherwise expressly provided herein, SUBCONTRACTOR shall provide each and every item of cost and expense necessary for:

Work as described in Exhibit "H"

hereinafter referred to as the Work.

1.3    *Specific Elements:* The Work shall include, but shall not necessarily be limited to, the following:

Work as described in Exhibit "H"

1.4    *Technical Specifications, Drawings, and Exhibits:* The Work shall be performed in strict accordance with the following specifications, drawings and other attachments hereto, which are specifically incorporated herein and made part hereof:

(Identify all specifications, drawings, or attachments applicable to the performance of the Work ...)

1.5    *Wiring Products:* In the event that the Work shall involve or require any electrical wiring products as may be identified in Exhibit G's Description, Application and Cable Specification, SUBCONTRACTOR shall only utilize those electrical wiring products as identified therein or a CONTRACTOR approved equal that meets all specifications of the Work. Anixter Inc. is CONTRACTOR's preferred provider of the electrical wiring products identified on Exhibit G.

1.6    It is the intent of this Subcontract that SUBCONTRACTOR provide a complete and fully operational system that meets or exceeds all performance criteria stated in the Subcontract Documents.

### Article 2: PERFORMANCE PERIOD/SCHEDULE

2.1    *Term:* SUBCONTRACTOR shall commence the Work on _____, ____, and shall prosecute the Work diligently and shall complete all Work not later than _____, ____.

2.2    *Milestones:* Specific scheduling milestones and coordination requirements are as follows:

2.3    *Time of Essence:* Time is of the essence in the performance of this Work. SUBCONTRACTOR shall make whatever adjustments in working hours, manpower, equipment, etc., deemed necessary to complete the Work in accordance with the term of the Subcontract and the specific schedule requirements hereof.

2.4    *Construction Schedule:* Specific scheduling and coordination requirements are as follows    :

2.4.1    SUBCONTRACTOR shall prepare and submit to CONTRACTOR a Construction Schedule for review and acceptance on or before the 10th day after execution of this Subcontract. The schedule shall be in conformance with the Subcontract Documents and shall be in sufficient detail to be used as a basis to track the progress of the Work. CONTRACTOR and SUBCONTRACTOR will review the proposed schedule. Any revisions resulting from this review shall be resubmitted to CONTRACTOR within 7 days.

2.4.2    The Construction Schedule shall be used by SUBCONTRACTOR for planning, organizing, directing and executing the Work and for reporting progress. If SUBCONTRACTOR desires to make changes in the method of operating or scheduling, SUBCONTRACTOR shall notify CONTRACTOR in writing, stating the reasons for same.

2.4.3    SUBCONTRACTOR shall also provide at the same time as the proposed Construction Schedule, a Schedule of Values of the Work in substantially the form of Form S-100 SV upon which payments will be measured. The Schedule of Values will include quantities and proposed billing amounts of items aggregating the total subcontract price and will subdivide the Work into component parts in sufficient detail to serve as the basis for progress payments during construction. Such proposed billing amounts will include an appropriate amount for overhead and profit applicable to each activity. CONTRACTOR will review the Schedule of Values and accept or reject such schedule. SUBCONTRACTOR shall make corrections in such schedule until acceptable to CONTRACTOR. The Schedule of Values will include only specifically identifiable and measurable elements of completed Work and will not separately list overhead items. Proposed billing amounts provided by SUBCONTRACTOR shall not be construed as, nor be considered to represent, the value or cost of any activity, nor to serve any purpose other than those specified herein.

FORM S-100
S-100 Subcontract Agreement Form
Department: Legal

Document Number: C05_99_FM0055
Version: 1.1

Published Date: 03/29/2013
Contract Page 2 of 17

# SIEMENS INDUSTRY, INC., BUILDING TECHNOLOGIES DIVISION

Exhibit A – NUMBER

***CONTAINS BOTH OPTIONAL AND NON-OPTIONAL PROVISIONS. OPTIONAL PROVISIONS SELECTED FOR INCLUSION IN THE SUBCONTRACT ARE NOTED BY CHECKING THE APPLICABLE BOX.***

2.4.4     The following items will be provided by CONTRACTOR.  The receipt of same shall be incorporated, by item, into the Construction Schedule:  **(APPLICABLE IF CHECKED HERE:** ☐ **)**

2.4.5     The Construction Schedule provided by SUBCONTRACTOR shall contain not less than 100 activities and not more than 500 activities, reflecting performance of the Work within the schedule defined in this Subcontract.  Each activity shall, at a minimum, include a description of the work to be performed, an estimated duration in units of working days and a proposed billing amount.

2.4.6     SUBCONTRACTOR, in conjunction with CONTRACTOR's Project Manager, shall update the schedule at 2 weeks, or other intervals requested by CONTRACTOR.  All approved Change Orders shall be included in the updated schedule.  The updated schedule shall identify activities or portions of same completed during the report period, percentage of Work actually completed, and corresponding proposed billing amounts, which serve as a basis for SUBCONTRACTOR's periodic payment requests.

## Article 3:  REPORTING REQUIREMENTS

3.1     *Progress Report:*  SUBCONTRACTOR shall submit a weekly progress report comparing actual progress to planned progress, and shall attend periodic progress review meetings.

3.2     *Other Reports:*  SUBCONTRACTOR shall submit the following reports:

3.2.1     Daily manpower and equipment report.  **(APPLICABLE IF CHECKED HERE:** ☒ **)**

3.2.2     By 9:00 AM each Friday, a two (2) week look-ahead schedule.  This schedule shall provide a detailed list of tasks to be performed during the scheduled period and shall list all associated future data, information, manpower, materials, equipment and other items required for the performance of the Work.  **(APPLICABLE IF CHECKED HERE:** ☒ **)**

3.2.3     On a monthly basis, a procurement status report of major and/or critical equipment and materials which shall include the following information:  **(APPLICABLE IF CHECKED HERE:** ☒ **)**
- Brief description of item
- Date of purchase and purchase order number
- Source and location of manufacturer
- Submittal and return dates of shop drawings
- Jobsite need date
- Original promise delivery date
- Current promise delivery date
- Expediting contacts
- Actual arrival date
- Remarks

3.2.4     Monthly safety reports.  **(APPLICABLE IF CHECKED HERE:** ☒ **)**

3.2.5     Subcontractor shall notify Contractor when any portion of the Work requiring inspection or approval by the Contractor is ready for same.  **(APPLICABLE IF CHECKED HERE:** ☒ **)**

3.2.6     Additional reports, if any  **(APPLICABLE IF CHECKED HERE:** ☐ **)**

Document Number: C05_99_FM0055
Version: 1.1

FORM S-100
S-100 Subcontract Agreement Form
Department:  Legal

Published Date: 03/29/2013
Contract Page 3 of 17

# SIEMENS INDUSTRY, INC., BUILDING TECHNOLOGIES DIVISION

Exhibit A – NUMBER

**(THE FOLLOWING SECTIONS 3.3 to 3.5 APPLY ONLY TO COST REIMBURSABLE AND/OR TIME AND MATERIALS SUBCONTRACTS.) (APPLICABLE IF CHECKED HERE: ☐ )**

3.3    *Inventory Control:* SUBCONTRACTOR is responsible for and shall maintain a current inventory of all materials, supplies and equipment purchased by SUBCONTRACTOR and/or furnished by CONTRACTOR or Customer for SUBCONTRACTOR's use in performing the Work. Any lost, damaged or stolen inventory items shall be replaced at the SUBCONTRACTOR's cost, on a monthly basis. All inventory items remaining at the conclusion of the Work shall be the property of CONTRACTOR or the Customer.

3.4    *Purchases and Rentals:* All purchases or rentals of reimbursable items must be approved in writing by CONTRACTOR regardless of dollar value. SUBCONTRACTOR shall solicit and submit for CONTRACTOR's approval a minimum of 3 written quotes, unless CONTRACTOR approves submittal of a lesser quantity, on all items exceeding $500.00 along with SUBCONTRACTOR's written evaluation and recommendation. CONTRACTOR reserves the option of (a) authorizing the SUBCONTRACTOR to procure the items directly and furnishing same to SUBCONTRACTOR, either utilizing or disregarding the quotations submitted by SUBCONTRACTOR.

3.5    *Labor Report:* SUBCONTRACTOR shall submit to CONTRACTOR daily reports specifying all reimbursable personnel by name, classification and employee number, the hours worked, and types and qualities of work performed by each individual. This report shall be submitted by 3:00 p.m. on the next workday following the day covered by the report. SUBCONTRACTOR shall submit such other records as CONTRACTOR may require.

## Article 4: DATA REQUIREMENTS

4.1    *Record drawings:*

4.2    *Submittals:*

4.2.1    SUBCONTRACTOR shall prepare shop drawings, supply catalog cuts and provide all other pertinent literature for SUBCONTRACTOR furnished materials and equipment. SUBCONTRACTOR shall submit one (1) reproducible original and three (3) copies of this data to CONTRACTOR for review and approval prior to any purchase or fabrication. If shop drawings show any deviation from the Work requirements, SUBCONTRACTOR shall make specific mention of the deviations in its letter of transmittal.

4.2.2    Such drawings shall show, as appropriate, the principal dimensions, weight, structural and operating features, including all loads transmitted to the foundation supports, space required, clearances, type and/or brand of finish or shop coat, etc. When it is customary to do so, when the dimensions are of particular importance, or when so specified, the drawings shall be certified by the SUBCONTRACTOR as correct for the purposes intended.

4.2.3    Should SUBCONTRACTOR submit drawings which reflect modifications from equipment specified, it shall also submit details of proposed modifications. If such equipment and modifications are accepted, SUBCONTRACTOR, at no additional cost to CONTRACTOR shall do all work necessary to make such modifications. However, if such modification causes a reduction in the Work, the price will be adjusted pursuant to the Subcontract Documents.

4.2.4    Shop drawing review and/or approval shall not constitute a change to the requirements hereof. Changes shall be made only as specified in the Subcontract Documents.

4.2.5    When so specified or if approved by CONTRACTOR, manufacturer's specifications, catalog data, descriptive matter, illustrations, etc., may be submitted in place of shop and working drawings.

4.2.6    SUBCONTRACTOR shall be responsible for the prompt and timely submittal of all shop and working drawings so that no delay to the Work results due to the absence of such drawings. Prior to submittal of any shop drawings, SUBCONTRACTOR shall submit a schedule of proposed shop drawing transmittals. The schedule shall identify the subject matter of each transmittal, the corresponding specification section number and the proposed date of submission. During the progress of the Work, the schedule shall be revised and resubmitted as necessary.

# SIEMENS INDUSTRY, INC., BUILDING TECHNOLOGIES DIVISION

Exhibit A – NUMBER

4.2.7    All shop and working drawings shall be submitted to CONTRACTOR by SUBCONTRACTOR, who shall be responsible for obtaining shop and working drawings from its lower tier subcontractors and returning reviewed drawings to them. All shop and working drawings shall be prepared on standard size, 24-in. by 36-in. sheets, except those which are made by changing existing standard shop or working drawings. All drawings shall be clearly marked with the names of CONTRACTOR, SUBCONTRACTOR, and the building, equipment, or structure to which the drawing applies, and shall be suitably numbered. Each shipment of drawings shall be accompanied by a letter of transmittal giving a list of the drawing numbers and the names mentioned above.

4.2.8    Prior to submitting drawings to CONTRACTOR, SUBCONTRACTOR shall check thoroughly all drawings to satisfy itself that the drawings conform to the Subcontract Documents in all respects. All drawings which are correct shall be marked with the date, checker's name, and indication of the SUBCONTRACTOR's approval, and submitted to CONTRACTOR; non-conforming drawings shall be returned for correction.

4.2.9    The review by CONTRACTOR of shop and working drawings hereunder will be general only, and nothing contained in this article shall relieve, diminish or alter in any respect the responsibilities of SUBCONTRACTOR under the Subcontract. SUBCONTRACTOR is and remains responsible for details of design and dimensions necessary for proper fitting and construction of the Work as required by SUBCONTRACTOR and for achieving the result and performance specified thereunder.

4.2.10    A marked-up reproducible copy of the shop and working drawings or one marked-up copy of catalog cuts will be returned to SUBCONTRACTOR. SUBCONTRACTOR shall furnish additional copies of such drawings or catalog cuts when so requested.

4.3    *Other data requirements:*

## Article 5:  *CONTRACTOR FURNISHED ITEMS* (APPLICABLE IF CHECKED HERE: ☒)

5.1    CONTRACTOR shall furnish and deliver, or cause to be delivered, to the Jobsite the following equipment, goods or material:


5.2    SUBCONTRACTOR shall be responsible for receiving, unloading, unpacking, inspecting, verifying receipt, maintaining, protecting, and installing CONTRACTOR furnished items.

Document Number:  C05_99_FM0055
Version: 1.1

FORM S-100
S-100 Subcontract Agreement Form
Department:  Legal

Published Date:  03/29/2013
Contract Page 5 of 17

# SIEMENS INDUSTRY, INC., BUILDING TECHNOLOGIES DIVISION

SUBCONTRACT AGREEMENT NUMBER

*PAYMENT SCHEDULE – EXHIBIT B*

*Article 1: SUBCONTRACT PRICE*

1.1    CONTRACTOR agrees to pay SUBCONTRACTOR for complete, satisfactory and timely performance of the Work, in strict accordance with the requirements hereof, the firm fixed price of $ 20,328,920.00.

*Article 2: INVOICES*

2.1    SUBCONTRACTOR's invoices shall be submitted to CONTRACTOR for approval.  Subcontractor may be paid pursuant to the agreed terms under the Siemens Corporate Finance Program (SCF), otherwise, it is agreed by the parties that Subcontractor's payment will be made one hundred and twenty (120) days after approval by CONTRACTOR.

2.2    SUBCONTRACTOR's invoices shall:
2.2.1    Reference the project name.
2.2.2    Reflect the SUBCONTRACT Number and PURCHASE ORDER Number.
2.2.3    Be numbered sequentially.
2.2.4    Be submitted in 3 copies to the attention of CONTRACTOR's Designated Representative.
2.2.5    Include a Requisition for Payment in the format of Form S-100 RP and Partial Waiver and Release of Lien to date in a form acceptable to CONTRACTOR.
2.2.6    Reflect ten percent (10%) retainage.
2.2.7    Be submitted on a monthly basis on the fifteenth (15th) day of each month, or the first normal working day thereafter.
2.2.8    Be accompanied by other supporting documentation as CONTRACTOR may reasonably require.
2.2.8    Be for the calendar month immediately preceding the invoice date and shall be based upon the most recent Schedule of Values or as follows:
2.2.9    Be submitted electronically via Siemens Invoices On-Line (IOL) process (http://www.iolportal.com/siemens) after CONTRACTOR has reviewed and approved each progress invoice with all supporting documentation.

*Article 3: PAYMENT SCHEDULE*

3.1    Based upon invoices submitted by the SUBCONTRACTOR in full conformity with the requirements of Article 2 of this Exhibit B and approved by the CONTRACTOR, the CONTRACTOR shall, subject to Section 2.1 above, make progress payments on account of the Subcontract Price to the SUBCONTRACTOR.

3.2    Final payment, constituting the entire unpaid balance of the Subcontract Price, shall be made by the CONTRACTOR to the SUBCONTRACTOR, subject to Section 2.1 above, when the Work is fully performed in accordance with the requirements of the Subcontract Documents and delivery of the following items to the CONTRACTOR:

3.2.1    Final Waiver and Release of Lien
3.2.2    Operation and maintenance manuals
3.2.3    Written warranties for equipment provided
3.2.4    As-built drawings
3.2.5    Consent of surety to final payment
3.2.6    Applicable permits and certificates of inspection

3.3    If CONTRACTOR determines that the Work is substantially complete and that the amount of retained percentages is in excess of the amount considered by CONTRACTOR to be adequate for the protection of CONTRACTOR, CONTRACTOR may, at CONTRACTOR's sole discretion, release to the SUBCONTRACTOR such excess amounts.  Subject to the other terms and conditions of this Subcontract, upon satisfactory completion of the Work hereunder, and its final acceptance, the SUBCONTRACTOR will be paid the undisputed unpaid balance of any money due hereunder.

3.4    To facilitate timely and efficient payment, Siemens requires all Subcontractors to participate in Siemens' Electronic Funds Transfer (EFT) program.  All payments under this S-100 Subcontract Agreement Form shall be made by an EFT to the vendor's account.  In the event that vendor has not timely submitted to Siemens the proper EFT enabling forms and accurate information to enable EFT payment, Siemens, may in its sole discretion temporarily suspend payment without cost to Siemens or additional compensation to vendor until such forms and information have been received by Siemens.  Any such suspension shall not relieve vendor of its obligations to continue to perform all of its responsibilities under the agreement.

Document Number: C05_99_FM0055
Version: 1.1

FORM S-100
S-100 Subcontract Agreement Form
Department: Legal

Published Date: 03/29/2013
Contract Page 6 of 17

# SIEMENS INDUSTRY, INC., BUILDING TECHNOLOGIES DIVISION

SUBCONTRACT AGREEMENT NUMBER

***SUPPLEMENTARY CONDITIONS – EXHIBIT C***

**(USE THE FOLLOWING CLAUSES OR INSERT ADDITIONAL CLAUSES AS APPLICABLE)**

*Article 1: BOND REQUIREMENTS* (APPLICABLE IF CHECKED HERE: ☒)

SUBCONTRACTOR shall provide a Performance Bond and a Labor and Material Payment Bond in a format and with corporate surety satisfactory to CONTRACTOR and licensed to do business in the state in which the Work is located, in an amount equal to the full amount of the Subcontract. Bonds furnished pursuant hereto shall stipulate that modifications, amendments and changes to the Subcontract shall in no way annul, release, diminish or affect the liability of the surety. Bonds shall be provided prior to commencement of work or within ten (10) days after the execution of this Subcontract, whichever is earlier.

*Article 2: LIQUIDATED DAMAGES* (APPLICABLE IF CHECKED HERE: ☒)

SUBCONTRACTOR and CONTRACTOR agree that the amount of damages sustained by CONTRACTOR due to SUBCONTRACTOR's delay of completion of the Work is difficult to determine, therefore it is agreed that, solely as compensation for the damages incurred by CONTRACTOR as a result of any such delay and not as a penalty for such delay, a reasonable forecast of the damages sustained by the CONTRACTOR arising out of such delay is:

$ 20,000.00 per day

The liquidated damages shall be CONTRACTOR's sole recovery of damages due to SUBCONTRACTOR's delay but shall not restrict or otherwise limit CONTRACTOR's other rights or remedies under this Subcontract for such delay. Each other such right or remedy, including but not limited to CONTRACTOR's right to terminate or take over SUBCONTRACTOR's performance are in addition to the liquidated damages provided in this section.

*Article 3: CERTIFIED PAYROLLS* (APPLICABLE IF CHECKED HERE: ☒)

SUBCONTRACTOR shall maintain, prepare and submit to CONTRACTOR weekly and with each invoice or request for payment such properly completed and executed payroll documentation as may be required by the Subcontract Documents or by law to comply with any applicable prevailing wage and certified payroll requirements for the Project. SUBCONTRACTOR shall be familiar with and comply with all prevailing wage and certified payroll requirements, including but not limited to, approved trade and labor classifications and prevailing or minimum wage requirements. SUBCONTRACTOR shall be responsible for and, to the fullest extent allowed by law, defend, indemnify and hold the CONTRACTOR and Customer harmless from any and all damages, costs, fines, penalties arising out of SUBCONTRACTOR's failure to comply with any prevailing wage or certified payroll requirements applicable to the Work.

*Article 4: PERFORMANCE DAMAGES* (APPLICABLE IF CHECKED HERE: ☐)

In the event of any delay in completion of the Work by SUBCONTRACTOR and provided that such delay is not excused or authorized pursuant to the Subcontract Documents, then, in addition to any other damages allowed pursuant to this Subcontract or by law, and any other provision of the Subcontract Documents notwithstanding, SUBCONTRACTOR shall be responsible for all damages to or against CONTRACTOR or the Customer arising out of such delay, including, but not limited to, any acceleration costs, lost energy cost savings and additional or extended finance costs. SUBCONTRACTOR acknowledges that by this section SUBCONTRACTOR has been advised of and made aware of the foreseeability of such damages.

*Article 5: ADDITIONAL PROVISIONS* (APPLICABLE IF CHECKED HERE: ☒)

Subcontractor agrees to abide by and adhere to all federal, state and local codes, laws and regulations including but not limited to OSHA, NEC, and ADA requirements. Subcontractor furthermore warrants that all costs associated with compliance including but not limited to permits, licensing and inspections fees are included in the scope of this project. Failure to ascertain any jurisdictional costs or requirements will not be considered entitlement for additional costs.

Failure to return an executed copy of this contract prior to the commencement of any work or ordering of materials will be deemed as full acceptance of the contract and all terms and conditions included

*SUBCONTRACTOR WILL NOT PERFORM OR EXECUTE ANY WORK ASSOCIATED WITH THIS SUBCONTRACT WITHOUT A WRITTEN NOTICE TO PROCEED*

FORM S-100
S-100 Subcontract Agreement Form
Department: Legal

Document Number: C05_99_FM0055
Version: 1.1

Published Date: 03/29/2013
Contract Page 7 of 17

# SIEMENS INDUSTRY, INC., BUILDING TECHNOLOGIES DIVISION

SUBCONTRACT AGREEMENT NUMBER

## *GENERAL CONDITIONS - EXHIBIT D*

These General Conditions are a part of each Subcontract between Siemens Industry, Inc., Building Technologies Division (Contractor) and its Subcontractor for the performance of the Work identified in the Subcontract.

### *Article 1: SERVICES BY SUBCONTRACTOR*
1.1     Subcontractor is responsible for obtaining and confirming all measurements and taking all other actions necessary for the technical accuracy, quality and timely completion of the Work in full conformity with all laws, regulations, codes and ordinances and with the Subcontract Documents.

1.2     Subcontractor shall prosecute the Work diligently with sufficient numbers of qualified personnel, equipment, materials and supplies to accomplish the Work and maintain the schedule or restore the schedule. Subcontractor shall provide Contractor with a detailed schedule of performance and shall update the schedule as the Work progresses. Contractor shall determine the normal hours of performance. Any special or differing hours shall be subject to the prior written approval of Contractor. Contractor shall have access at all times to the locations where Work is performed and to all drawings, data specifications, calculations, documents, test results and specimens, models and other things related to the Work or the Project as a whole.

1.3     Subcontractor shall furnish and be responsible for the ordering and payment of all supervision, labor, supplies, materials, utilities, tools, equipment, facilities, storage, permits, inspections, licenses and all other things necessary or desirable to accomplish the Work except as specified, in the Subcontract Documents, to be supplied by Contractor or Customer.

1.4     Subcontractor is solely responsible for the payment of, and shall require its lower tier subcontractors to pay, all assessments, taxes, benefits, and insurance premiums in connection with the Work.

1.5     Subcontractor is responsible for the health and safety of its employees and the employees of its lower tier subcontractors. Subcontractor shall comply with all safety programs, practices or procedures, if any, established, recommended or required by Contractor, Customer, or any governmental or quasi-governmental authorities.

1.6     Subcontractor shall be responsible for the security of the Work and shall take all reasonable precautions to prevent theft, loss and waste at the Jobsite.

1.7     Subcontractor shall at all times keep the premises and the vicinity of the Work free and clean of all debris and rubbish. If Subcontractor fails to commence cleanup within 24 hours of notice from Contractor of non-compliance, Contractor may commence cleanup without further notice to Subcontractor and deduct the cost of same from any amount due or to be due Subcontractor.

1.8     The Subcontractor shall be responsible for coordinating the Work with the work of other trades on the Project. The Subcontractor shall be responsible for the resolution of any and all disputes between itself and other trades on the Project and shall be responsible for any cost, expense or delay resulting therefrom.

### *Article 2: COMMUNICATIONS & NOTICES*
2.1     All inquiries Subcontractor may have concerning this Subcontract shall be made to Contractor and not directly to Customer.

2.2     All of Subcontractor's correspondence or communication regarding this Subcontract shall include Contractor's Subcontract Number and Work Description, and shall be mailed or delivered to Contractor's Designated Representative.

2.3     Notices of changes, deficiencies, delays, claims or disputes shall be in writing delivered within 5 business days of occurrence or discovery of same, and shall furnish full information to the extent available. The party notified will acknowledge receipt by endorsement of a copy if requested or will otherwise confirm receipt in writing. Sufficient Notice shall be deemed to have been given if made by express courier or mailing via Registered or Certified Mail postage prepaid to the address shown on page 1 of this Subcontract.

2.4     Subcontractor shall not use or release any advertisement, notice or publicity depicting or describing the Work, Contractor or Customer at any time, whether before, during or after completion of the Work, without the express prior written consent of the Contractor. No signs (except reasonably necessary warnings) shall be placed upon the Jobsite without Contractor's express prior written approval.

### *Article 3: CHANGES*
3.1     Contractor may from time to time, by written order, and without notice to any surety and without invalidating this Subcontract, or any portion thereof, make changes in the Work, or the conditions under which it is to be performed, or may increase or decrease the services to be performed. The Subcontractor shall not make changes in the Work or its manner of performance without prior written authorization from Contractor. If such changes increase or decrease either the cost or time required to perform the Work set forth in this Subcontract, then the parties will mutually agree upon an equitable adjustment to the price and/or the time to perform the Work under this Subcontract. Any such modification to this Subcontract shall be in writing, shall define the extent of the change, the price or basis of pricing the change, the impact of the change on the schedule, and shall be signed by both parties. Subcontractor acknowledges and agrees that it waives all right or claim for compensation for any additional or other work not specifically authorized in writing by Contractor's Designated Representative prior to the commencement of such work.

### *Article 4: DOCUMENTS*
4.1     All documents generated by Subcontractor hereunder, including original drawings, estimates, reports, specifications, calculations, field notes, data and work product, are to become the property of and be delivered to Contractor. Subcontractor may at its own expense retain reproducible copies of the documents solely for record purposes. All discoveries, inventions, patents, know-how, trade secrets, computer code, or other proprietary information generated hereunder shall be the property of Contractor or if Contractor so designates, of Customer. Subcontractor will take appropriate action to assign and transfer same to Contractor or Customer.

4.2     Subcontractor warrants that it has examined and reviewed the Subcontract Documents and all other documents, schedules, drawings and data applicable to the Work and that Subcontractor is thoroughly familiar with the intent, scope and extent of the Work. Should any errors, omissions, defects or inconsistencies appear in such documents, Subcontractor shall notify Contractor within 5 business days of discovery and shall not proceed with the affected Work portion until it has brought same to the attention of Contractor and received a written interpretation or instruction from Contractor.

Document Number: C05_99_FM0055
Version: 1.1

FORM S-100
S-100 Subcontract Agreement Form
Department: Legal

Published Date: 03/29/2013
Contract Page 8 of 17

# SIEMENS INDUSTRY, INC., BUILDING TECHNOLOGIES DIVISION

Exhibit D – NUMBER

### Article 5: CONFIDENTIAL INFORMATION

5.1    Subcontractor shall not, without prior written approval of Contractor, either during or subsequent to the term of this Agreement, disclose or use or enable another to disclose or use, any secret, private or confidential data, drawings, programs, source code, systems, information, trade secrets or other proprietary information of Contractor, Customer or their respective affiliates, customers or consultants. Upon termination of this Agreement, Subcontractor shall deliver to Contractor all equipment, specifications, data, memoranda, documents, drawings and other information, including all copies thereof in any form, pertaining to Contractor or any affiliate or customer thereof, which are then in Subcontractor's possession. Subcontractor agrees that all such information and documents shall be the property of Contractor. The term "affiliate" as used in this Agreement shall mean any corporation, firm or business controlling, controlled by, or under common control with the respective party. Control shall mean direct or indirect ownership of 50% or more of the equity or beneficial interest of the corporation, firm or business.

### Article 6: INVENTIONS AND DISCOVERIES

6.1    Subcontractor hereby agrees that all inventions, trade secrets, discoveries, improvements, ideas and processes, (hereinafter, collectively, the "Developments") patentable or otherwise, which Subcontractor makes, develops, receives or first reduces to practice during the performance of the Work hereunder or within one (1) year thereafter if resulting from or suggested by the Work, shall be the sole and exclusive property of Contractor.

6.2    Subcontractor agrees that it will promptly make all necessary disclosures, execute, acknowledge, and deliver all instruments, and perform all acts within its power necessary or desired by Contractor to enable Contractor at its own expense to file applications for and to obtain patents for or on the Developments whenever and in whatsoever countries it may so desire, and to fully and completely cooperate with Contractor in submitting all applications, patents, trademark registrations, and copyrights relating to the developments, and enable Contractor to secure, maintain, protect, enforce, and defend the same and enjoy the full benefits thereof.

### Article 7: FORCE MAJEURE

7.1    Neither party will be in default of its performance or liable to the other party for delays in performance caused by strikes, war, riots, acts of governmental authorities, extraordinary weather conditions, acts of God or any cause beyond the reasonable control or contemplation by the parties. Subcontractor's sole remedy in the event of any such delay shall be a reasonable schedule extension.

### Article 8: SUSPENSION OF PERFORMANCE

8.1    Contractor may require Subcontractor to suspend performance hereunder completely or partially for whatever length of time Customer or Contractor may elect. The time for completion shall be extended by a period equal to such suspension. Contractor and Customer shall not be liable for any damages, be they direct, consequential or otherwise, suffered by Subcontractor due to delays and suspensions. Subcontractor shall be obligated to proceed with the work notwithstanding a dispute on reimbursement; such action shall not prejudice either party's claim with respect to reimbursement.

### Article 9: TERMINATION

9.1    Contractor may terminate this Subcontract, in whole or in part, at any time, with or without cause and without serving prior notice. If this Subcontract is so terminated, Subcontractor shall be paid for all services performed to the date of termination including, in the event the termination is not for cause, all reasonable termination expenses, but shall not be paid for Work not performed by Subcontractor. Any progress payments made to Subcontractor shall be credited toward any termination payment due. Such termination payment will constitute Subcontractor's full compensation to which it is entitled under this Subcontract and Subcontractor waives any claim for damages, including loss of anticipated profits, arising out of such termination.

9.2    Upon receipt of a termination notice, Subcontractor shall: (a) promptly discontinue all services to the extent directed; (b) take reasonable precautions to protect the Work in process; and (c) deliver or otherwise make available to Contractor all data, drawings, calculations, reports and all other information and materials which have been accumulated or developed by Subcontractor in performing this Subcontract, whether completed or in progress.

9.3    In the event of any termination for cause, Contractor shall be entitled to offset against any monies owed to Subcontractor all additional costs, expenses or charges incurred or paid by Contractor in connection with or arising out of such termination. If such additional amounts exceed monies owed Subcontractor, Subcontractor agrees to pay to Contractor, within seven (7) days of demand, any such excess.

9.4    In the event of any termination for cause, Contractor shall be entitled to take and use any materials, equipment, supplies or tools furnished by, or belonging to the Subcontractor located at the Jobsite.

### Article 10: DISPUTES

10.1    All questions arising under this Agreement shall be resolved in the first instance by Contractor's Project Manager. No claim for additional compensation or extension of time shall be considered unless presented to Contractor's Project Manager in writing within ten (10) calendar days after the occurrence giving rise to the dispute. Any claim not satisfactorily resolved by Contractor's Project Manager in the first instance, and which is presented in writing within the time provided, may be appealed by notice in writing to Contractor's Designated Representative within ten (10) calendar days after the Project Manager's initial decision.

10.2    All claims, disputes and other matters in question, arising out of or relating to this Subcontract or the breach thereof, except for claims which have been waived by the making or acceptance of final payment, may be litigated before any court of competent jurisdiction.The parties mutually agree to hereby waive their rights to a jury trial with respect to any matter arising hereunder.

10.3    The Subcontractor shall carry on the Work and maintain the project schedule during any dispute proceedings, unless otherwise instructed by Contractor.

FORM S-100
S-100 Subcontract Agreement Form
Department: Legal

Document Number: C05_99_FM0055
Version: 1.1

Published Date: 03/29/2013
Contract Page 9 of 17

# SIEMENS INDUSTRY, INC., BUILDING TECHNOLOGIES DIVISION

Exhibit D -- NUMBER

**Article 11: INDEMNITY**
11.1    For separate consideration of ten dollars ($10.00) the receipt and sufficiency of which is hereby acknowledged, the Subcontractor shall indemnify, defend and hold Contractor and Customer and each of their respective employees, agents or subcontractors harmless from any and all losses, damages, settlements, costs, charges, expenses or liabilities of every kind or character, including reasonable attorneys' and witness' fees and other costs of defense and settlement, arising out of or relating to any and all claims, liabilities, losses, fines, penalties, liens, demands, obligations, actions, proceedings, or causes of action of every kind arising, including but not limited to death or injury to any person, destruction or damage to any property, or contamination or adverse effect upon natural resources or the environment, to the extent arising, in whole or part, out of any:  (1) failure of Subcontractor, its employees, agents or subcontractors to comply with any law, ordinance, regulation, rule or order of any governmental or regulatory body including those dealings with health, safety or the environment; (2) improper, substandard, or inadequate performance or non-performance of this Subcontract, including any submission of deficient cost or pricing data; or (3) any negligent or wrongful act or omission of the Subcontractor, its employees, agents, suppliers or subcontractors. In no event shall Contractor or Customer be liable to Subcontractor for indirect or consequential damages or loss of income or profit irrespective of the cause, fault or reason for same.

**Article 12: PROPRIETARY RIGHTS**
12.1    Subcontractor indemnifies Contractor against any loss, cost or liability for infringement of any patent, copyright or proprietary right involving any Work furnished hereunder.

**Article 13: ASSIGNMENT & SUBCONTRACTS**
13.1    Subcontractor's duties and obligations hereunder are personal and shall not be assignable or delegable by it in any manner. Subcontractor's rights and interest hereunder may not be assigned, pledged or otherwise encumbered without the prior written consent of Contractor.

13.2    Subcontractor shall not further subcontract any portion of the Work without Contractor's prior written consent.  In any event, any subcontracting by Subcontractor shall in no event relieve Subcontractor of its responsibilities, obligations or guaranties for such subcontracted portions of the Work or anything arising out of such subcontracting.

**Article 14: PARTIAL USE OR OCCUPANCY**
14.1    Contractor and Customer may use and occupy any portion of the Work.  Such partial use or occupancy shall not imply an acceptance by Contractor or Customer of that or any other portion of the Work and shall not relieve Subcontractor of the obligation to complete all of the Work strictly in accordance with the Subcontract.

**Article 15: LIENS**
15.1    To the extent permitted by law, Subcontractor for itself and all of its subcontractors, laborers, suppliers, mechanics and materialmen hereby waives and agrees not to claim any lien against the Work.

**Article 16: EMPLOYMENT PRACTICES**
16.1    Subcontractor shall not discriminate against any employee or applicant for employment because of race, color, religion, sex, national origin, age or any reason prohibited by law.  Subcontractor shall comply with Executive Order 11246, or any amendment, replacement or counterpart thereof.

16.2    Subcontractor agrees and affirms that they have completed and retained the required I-9's for its employees. Subcontractor agrees: they have examined the legal work status of its employees; they have retained file copies of the documents required by 8 U.S.C. SEC.1234a used to verify the employees' legal work status; have neither altered nor falsified the employees' identification documents. In the case where FAR 52.222-54 applies, Subcontractor agrees to confirm its employees have been verified and approved through the E-Verify system and the Department of Homeland Security.  In addition, Subcontractor agrees to provide Contractor with evidence of such verification if requested by Contractor.

**Article 17: WARRANTY**
17.1    Subcontractor warrants that all materials, equipment and workmanship furnished by Subcontractor shall be new, merchantable and fit for the purposes intended by the Subcontract and shall comply in all respects with the Subcontract Documents and shall be free of defects for a period of one (1) year from the date of acceptance of the Work or such longer period required in the Subcontract Documents.

**Article 18: INSURANCE**
18.1    Subcontractor shall provide and maintain the insurance required by Exhibit E.

**Article 19: HEADINGS AND SEVERABILITY**
19.1    The headings in the Subcontract, Exhibits and attachments thereto are for quick reference only and are not to be construed as a part of this Subcontract.

19.2    If any provision of this Subcontract is determined to be invalid under any law, such decision shall not affect the remaining portion, which remaining portion shall continue in full force and effect as if it had been executed with the invalid portion eliminated.

**Article 20: HAZARDOUS MATERIALS**
20.1    A Hazardous Material is any substance or material identified now or in the future as hazardous under any federal, state or local law or regulation, or which is subject to statutory or regulatory requirements governing its handling, disposal or remediation. Subcontractor shall have the same obligations with respect to such Hazardous Materials within the scope of the Work as Contractor may have under the Subcontract Documents or by law.

Document Number: C05_99_FM0055
Version: 1.1

FORM S-100
S-100 Subcontract Agreement Form
Department: Legal

Published Date: 03/29/2013
Contract Page 10 of 17

# SIEMENS INDUSTRY, INC., BUILDING TECHNOLOGIES DIVISION

Exhibit D – NUMBER

**Article 21: CODE OF CONDUCT**
21.1     Contractor strives to demonstrate high ethical standards in its business practices, and Subcontractor plays an integral part in making this happen.  The Supplier Code of Conduct contains the minimum standards by which Subcontractor is expected to conduct itself when providing goods and services to Contractor and agrees to the following:

1) Subcontractor agrees to comply with the principles and requirements of the Contractor's 'Supplier Code of Conduct' and related provisions that are located at http://www.usa.siemens.com/btcodeofconduct (hereinafter referred to as the 'Code of Conduct').

2) If requested by Contractor, Subcontractor shall not more than once a year either – at this option – provide Contractor with (i) a written self-assessment in the form provided by Contractor, or (ii) a written report approved by Contractor describing the actions taken or to be taken by Subcontractor to assure compliance with the Code of Conduct.

3) Contractor and its authorized agents and representatives and/or a third party appointed by Contractor and reasonably acceptable to Subcontractor, shall be entitled (but not obliged) to conduct – also at Subcontractor's premises – inspections in order to verify Subcontractor's compliance with the Code of Conduct.  Any inspection may only be conducted upon prior written notice of Contractor, during regular business hours, in accordance with the applicable data protection law and shall neither unreasonably interfere with Subcontractor's business activities nor violate any of Subcontractor's confidentiality agreements with third parties.  Subcontractor shall reasonably cooperate in any inspections conducted.  Each party shall bear its expenses in connection with such inspection.

4) In addition to any other rights and remedies Contractor may have, in the event of (i) Subcontractor's material or repeated failure to comply with the Code of Conduct or (ii) Subcontractor's denial of Contractor's right of inspection as provided for in the third paragraph of this article, after providing Subcontractor reasonable notice and a reasonable opportunity to remedy, Contractor may terminate this agreement and/or any purchase order issued hereunder without any liability whatsoever.  Material failures include, but are not limited to, incidents of child labor, corruption and bribery, and failure to comply with the Code of Conduct's environmental protection requirements.  The notice and opportunity to remedy provision shall not apply to violations of requirements and principles regarding child labor as set out in the Code of Conduct or willful failures to comply with the Code of Conduct's environmental protection requirements.

**Article 22: GOOD FAITH**
22.1     Subcontractor shall act in good faith at all times in the fulfillment of its contractual obligations.

22.2     Subcontractor represents that it has not, communicated, worked with, colluded, conspired, coordinated, or in any manner made contact with other installers that were invited by Contractor to provide bids for installation work in order to manipulate, coordinate the geographic area, pricing, or amount of work let by the Contractor to Subcontractor, its employees and affiliates.

22.3     Subcontractor shall keep all bid packages, site lists, site specifications, or any other information provided to them by Contractor strictly confidential and shall not share any of this information with any other firm, installer or person.  Subcontractor also agrees to return all copies of any information given by Contractor to Subcontractor upon Contractor's request.

22.4     Subcontractor agrees that should Contractor reasonably suspect that the Subcontractor has violated its obligation to act in good faith or breached any of the obligations specified in this article, any Work assigned to the Subcontractor and this Agreement itself, may be canceled without notice at Contractor's sole discretion.  This remedy is in addition to the Contractor's other remedies available in equity or law.

**Article 23: COUNTRY OF ORIGIN**
23.1     Subcontractor agrees to provide Contractor with a certified Country of Origin document for any and all products, materials or software ("Products") certifying that the country of origin data for all Products is accurate and complete.  At any time the Subcontractor modifies the country of origin data, factory location, or country of operation, it shall provide Contractor with advance written notice and an updated and certified Country of Origin document.  Subcontractor shall comply with all applicable laws and regulations, including but not limited to, the Trade Agreements Act (TAA) and the Buy American Act (BAA) (see 48 CFR 52.225-1 through 52.225-13) as well as the American Recovery and Reinvestment Act of 2009 (ARRA) (see 48 CFR 52.225-21 through 52.225-24; see also 2 CFR 176.140 and 176.160).  Subcontractor agrees to provide detailed information and verify to Contractor any information regarding such Products and assist in any governmental audit of the Products and its country of origin.

# SIEMENS INDUSTRY, INC., BUILDING TECHNOLOGIES DIVISION

SUBCONTRACT AGREEMENT NUMBER

### *INSURANCE SPECIFICATIONS - EXHIBIT E*

Unless otherwise specified in this Subcontract, the SUBCONTRACTOR shall, at its sole expense, maintain in effect at all times during performance of the Work Insurance coverage with limits not less than the greater of those required by the Customer, any Subcontract Document or as set forth below with Insurers and in forms of policies satisfactory to CONTRACTOR.

*Article 1:  COVERAGES*

1.1    WORKER'S COMPENSATION INSURANCE
Minimum Amounts and Limits as prescribed by applicable law.  If there is an exposure of injury to SUBCONTRACTOR'S employee under the U.S. Longshoremen's and Harbor Worker's Compensation Act, the Jones Act or under laws, regulations or statutes applicable to maritime employees, coverage shall be provided for same.

1.2    EMPLOYER'S LIABILITY INSURANCE (AND, WHERE APPLICABLE, STOP GAP EXTENDED PROTECTION ENDORSEMENT)
Limits of liability shall be:

       $1,000,000 Per Occurrence
       $1,000,000 Disease Policy
       $1,000,000 Each Employee

1.3    GENERAL LIABILITY INSURANCE
(a)    SUBCONTRACTOR shall carry, in the Occurrence Coverage Form, Comprehensive General Liability or Commercial General Liability, Insurance covering all operations by or on behalf of the SUBCONTRACTOR providing insurance for bodily injury and property damage with limits of liability stated below and including coverage for:

- Products and Completed Operations
- Contractual Liability insuring the obligations assumed        by the SUBCONTRACTOR in this Agreement
- CONTRACTOR's Protective Liability
- Broad Form Property Damage (including Completed        Operations)
- Installation Floater or Builders All Risk coverage
- Explosion, Collapse and Underground Hazards
- Personal Injury Liability

(b)    Limits of Liability shall be:

(1)    If Comprehensive General Liability insurance, limits of liability shall be:

       $1,000,000 Each Occurrence & Aggregate

(2)    If Commercial General Liability insurance, the limits of liability shall be:

       $1,000,000 Each Occurrence Limit
       $1,000,000 Personal Injury Limit
       $1,000,000 Products-Completed Operations Aggregate Limit
       $1,000,000 General Aggregate Limit

1.4    AUTOMOBILE LIABILITY INSURANCE
(a)    SUBCONTRACTOR shall carry Automobile Liability Insurance in the Occurrence Coverage Form covering all owned, hired and non-owned automobiles and trucks used by or on behalf of the SUBCONTRACTOR providing insurance for bodily injury and property damage liability for the limits stated below.  If SUBCONTRACTOR'S General Liability insurance is provided by the Commercial General Liability policy, then SUBCONTRACTOR'S Automobile Liability shall include coverage for Automobile Contractual Liability.

(b)    Limits of liability shall be:

(1)    If carrying Automobile Liability insurance with a combined single limit ("CSL") the CSL shall be:

       $1,000,000 CSL

(2)    If carrying Automobile Liability insurance with separate limits of liability, the limits shall be:

       $1,000,000 Each Person/Bodily Injury
       $1,000,000 per Occurrence & Aggregate - Bodily Injury
       $1,000,000 per Occurrence & Aggregate - Property Damage

*Article 2:  SPECIAL COVERAGES*

2.1    Should any of the Work:

(a)    Involve watercraft owned, operated or chartered by the SUBCONTRACTOR, liability arising out of such watercraft shall be insured by the General Liability Insurance or by Protection and Indemnity Insurance with a CSL of not less than $1,000,000 each occurrence.

(b)    Involve the hauling and/or rigging of property in excess of $100,000, SUBCONTRACTOR shall carry "All Risk" Transit Insurance, or "All Risk" Motor Truck Cargo Insurance.  Such insurance shall provide a limit of not less than the replacement cost of the highest value single lift or highest value being moved, whichever is greater, and insuring the interest of SUBCONTRACTOR, CONTRACTOR, and Customer as their respective interests may appear.

(c)    Involve aircraft (fixed wing or helicopter) owned, operated or chartered by the SUBCONTRACTOR, liability arising out of such aircraft shall be insured for not less than $1,000,000 CSL each occurrence.

(d)    Involve any form of professional services, including but not limited to engineering, architectural, laboratory, drafting, consulting or analysis services, SUBCONTRACTOR shall maintain during the term of the Subcontract and for 5 years thereafter Professional Liability insurance with limits of $1,000,000 per claim.

FORM S-100

Document Number: C05_99_FM0055
Version: 1.1

S-100 Subcontract Agreement Form
Department: Legal

Published Date: 03/29/2013
Contract Page 12 of 17

# SIEMENS INDUSTRY, INC., BUILDING TECHNOLOGIES DIVISION

Exhibit E – NUMBER

### Article 3: SUBCONTRACT WORK COVERAGE
3.1     Neither Customer nor CONTRACTOR is maintaining any insurance on behalf of SUBCONTRACTOR insuring against loss or damage to the Work or to any other property of SUBCONTRACTOR unless otherwise specifically stated herein.  If SUBCONTRACTOR maintains insurance against physical loss or damage to SUBCONTRACTOR'S construction equipment and tools, such insurance shall include a waiver of subrogation rights in favor of Customer and CONTRACTOR, and their respective subsidiaries, affiliates, officers, directors and employees.

### Article 4: NON-LIMITATION OF LIABILITY
4.1     The requirements contained herein as to types and limits, as well as CONTRACTOR's approval of insurance coverage to be maintained by SUBCONTRACTOR are not intended to and shall not in any manner limit or qualify the liabilities and obligations assumed by SUBCONTRACTOR under the subcontract and are not intended as a statement or recommendation of the adequacy of insurance coverages to be maintained by the SUBCONTRACTOR.

### Article 5: ADDITIONAL INSURED STATUS
5.1     The Customer and CONTRACTOR, and their respective subsidiaries, or affiliates, officers, directors and employees shall be included as Additional Insureds under all insurance policies and coverages maintained by or required to be maintained by SUBCONTRACTOR pursuant to the Subcontract Documents; excluding only Worker's Compensation and Employer's Liability and policies.  Each policy shall provide that it is primary insurance as regards the additional insureds and contain a cross-liability or severability of interest clause.

### Article 6: WAIVER OF SUBROGATION
6.1     Each of the insurance policies and coverages maintained by or required to be maintained by SUBCONTRACTOR by the Subcontract Documents, without exception, shall contain a waiver of subrogation in favor of Customer and CONTRACTOR and their respective subsidiaries, affiliates, officers, directors and employees.

### Article 7: CERTIFICATES OF INSURANCE
7.1     The SUBCONTRACTOR shall deliver signed original Certificates of Insurance to CONTRACTOR no later than ten (10) days after award of the subcontract but in any event prior to commencing the Work as evidence that policies providing such coverage and limits of insurance are in full force and effect.  Failure to deliver the required insurance certificates shall be grounds for termination of the Subcontract without further notice by CONTRACTOR or at CONTRACTOR's sole election, CONTRACTOR may obtain the necessary coverage at SUBCONTRACTOR's expense, the cost of which shall be offset against any sums owing or to be owed by CONTRACTOR to SUBCONTRACTOR.  Certificates shall provide that not less than thirty (30) days advance notice will be given in writing to CONTRACTOR prior to cancellation, termination or material alteration of said policies of insurance.  Certificates shall identify on their face the PROJECT NAME and the applicable Subcontract Number.  Each insurance certificate shall require that the insurance company provide 30 days advance notice to CONTRACTOR and, if applicable, to Customer of any cancellation of or material change in the policy or coverages identified on the certificate and provided by the insurer.

### Article 8: BEST RATING
8.1     All insurance companies must be "BEST's" rated "A" or better; qualified to do business in the state of the Work; and otherwise acceptable to CONTRACTOR and Customer.

### Article 9: NON-WAIVER
9.1     Receipt or failure to receive any Certificate of Insurance for any of the required insurance coverages and limits shall not act or be construed as an approval of SUBCONTRACTOR's insurance or as a release or waiver of SUBCONTRACTOR's obligation to provide any or all of the insurance coverages and limits required herein.  No delay or failure in declaring any default or in enforcing any such requirements, and no course of dealings between the CONTRACTOR and the SUBCONTRACTOR, or any other person or entity shall constitute a waiver of any requirement, or in any way or manner prejudice, impair, diminish or restrict any right, power or remedy available to CONTRACTOR.

### Article 10: CERTIFICATE DELIVERY
10.1     The SUBCONTRACTOR shall deliver the original of the Certificate of Insurance, naming CONTRACTOR, and if applicable the Customer, as the Certificate Holder, to the CONTRACTOR's Designated Representative.

Document Number: C05_99_FM0055
Version: 1.1

FORM S-100
S-100 Subcontract Agreement Form
Department: Legal

Published Date: 03/29/2013
Contract Page 13 of 17

# SIEMENS INDUSTRY, INC., BUILDING TECHNOLOGIES DIVISION

SUBCONTRACT AGREEMENT NUMBER

### *GENERAL SAFETY RULES - EXHIBIT F*

It is imperative that the general principle underlying all of the safe practices and procedures on the Project be understood by all SUBCONTRACTORS, namely, that each SUBCONTRACTOR is required to maintain at all times and in all areas a safe place to work, and is required to use safe methods while performing the Work.

CONTRACTOR shall have the right to direct the removal from the Project of any of the SUBCONTRACTOR's unsafe tools or unsafe equipment, and any personnel for violations of safety rules at no additional cost to CONTRACTOR or Customer.

SUBCONTRACTORS performing any work at the Project shall, at a minimum, comply with the following safety requirements:

A.  Before beginning work at the Project, each SUBCONTRACTOR shall file all required insurance certificates with CONTRACTOR.

B.  Each SUBCONTRACTOR, before beginning work, shall first secure permission and any special instructions from CONTRACTOR.

C.  Compliance is required with the safety rules and practices prescribed by CONTRACTOR, Customer, OSHA, and other applicable federal, commonwealth, state, national and local agencies; including but not limited to the following:

   Each SUBCONTRACTOR shall:

   1.  Hold weekly safety training meetings for all of its employees and give daily safety instructions as needed.
   2.  Provide, maintain and use safe tools and equipment for the performance of its work.
   3.  Furnish, and require the use of, proper personal protective equipment for its employees (such as hard hats, eye protection, respirators, safety belts, etc.). Safety shoes are recommended. Soft footwear (such as sandals or sneakers) is prohibited.
   4.  Prohibit firearms, alcoholic beverages, drugs or other controlled substances on the Project.
   5.  Prohibit horseplay or fighting on the Project.
   6.  Comply with posted traffic regulations.
   7.  Have a reverse signal, or a flagman direct reverse travel for all vehicles having an obstructed view to the rear.
   8.  Keep blades of bulldozers and forklifts, and buckets of shovels and frontend loaders, down when not in use. The booms of cranes shall be lowered at the end of the shift and over the weekends and holidays, when it is practical to do so.
   9.  Prohibit crane booms, loads, load lines, shovel booms or buckets from being operated within 10 feet of energized overhead power lines rated at 50KV or below. Greater distances are required above 50KV ratings.
   10. Remove debris from work areas, storage areas, walkways and roads. It may be temporarily accumulated only in designated containers or areas until such time that it can be removed from the Project.
   11. Remove exposed nails, or bend them over, to prevent puncture wounds.
   12. Keep cords, cables, and hoses out of walkways to prevent tripping hazards.
   13. Have ground fault protection for tools, extension cords and receptacles on temporary electrical systems.
   14. Cover or barricade all floor, roof, and wall openings. Covers shall be adequate to support all intended loads.
   15. Provide and maintain sufficient fire protection equipment (such as portable fire extinguishers, temporary fire hoses and water supplies, etc.)
   16. Equip all mobile equipment, such as trucks, cranes, bulldozers, etc. with individual fire extinguishers.
   17. Obtain flame permits when required by CONTRACTOR.
   18. Use extreme care with all open flame equipment.
   19. Keep flammable liquids in properly equipped storage tanks or in safety cans.
   20. Properly slope or shore the sides of trenches and excavations.
   21. Use scaffolds properly equipped with guardrails, midrails and full decking between the guardrails. Toeboards and screening shall be installed if people are required to pass under the scaffolds.
   22. Prohibit single plank runways or ramps. Two-plank width is the minimum requirement.
   23. Cover vertical reinforcing bars to prevent a puncture or impalement hazard.
   24. Barricade areas in which overhead work is performed, and post "overhead work" signs.
   25. Use danger tags only for their intended purpose, which is to prevent the operation of a switch or valve.
   26. Immediately report any hazardous condition or safety or health concerns that become known to it whether arising from the Work or any other source at the Project.
   27. **Report all injuries immediately to CONTRACTOR.**

D.  If a specific interpretation is needed for a special and/or unusual safety problem which is not covered by the OSHA standards, reference may be made to: American National Standards Institute's Safety Standards for Construction; A.G.C.'s Manual of Accident Prevention in Construction; or National Safety Council's Data Sheets for Construction or Accident Prevention Manual for Industrial Operations.

E.  The practices, procedures and requirements set forth herein shall apply equally to SUBCONTRACTOR and all lower tier subcontractors. It is mandatory that the SUBCONTRACTOR include the provisions hereof in all contracts with their lower tier subcontractors, if any.

# SIEMENS INDUSTRY, INC., BUILDING TECHNOLOGIES DIVISION

Exhibit F – NUMBER

OCCUPATIONAL HEALTH AND SAFETY

A. SUBCONTRACTOR, its parent, subsidiaries, affiliates, its and their employees, contractors, direct and indirect subcontractors, agents and representatives (hereinafter "SUBCONTRACTOR Representatives") who provide Services or any work under this Agreement, shall (a) comply with all federal, state and local statutes, laws regulations and ordinances concerning health, environment, and safety (collectively referred to as "EHS Laws"), (b) eliminate hazards for the health and safety of SUBCONTRACTOR, SUBCONTRACTOR Representatives, CONTRACTOR personnel and/or third parties; and (c) ensure that no persons who perform or are exposed to such Services or work, suffer any injury.

B. Before the commencement of the Services or other work hereunder, SUBCONTRACTOR shall provide CONTRACTOR with SUBCONTRACTOR's written risk assessment identifying (a) all known risks to health and safety inherent in the Services or work to be performed under the Agreement, and b) measures SUBCONTRACTOR will take to eliminate such risks to SUBCONTRACTOR, SUBCONTRACTOR Representatives, CONTRACTOR personnel and/or third parties in the performance of such Services or work.

C. SUBCONTRACTOR shall (a) ensure that all SUBCONTRACTOR Representatives take part in site-specific safety training, should it be offered by CONTRACTOR; (b) select all equipment ("Equipment"), including but not limited to personal protection equipment, used by SUBCONTRACTOR and SUBCONTRACTOR Representatives in performing the Services or work hereunder, that comports with the highest industry standards and EHS Laws before starting such Services or work; (c) train SUBCONTRACTOR Representatives how to use the Equipment in a safe and appropriate manner; and (d) maintain Equipment in good working order at all times and in accordance with all applicable EHS Laws.

D. CONTRACTOR reserves the right, at its sole discretion, to bar SUBCONTRACTOR or any SUBCONTRACTOR Representative from a facility or worksite owned, operated or controlled by CONTRACTOR, its Affiliate or customer of CONTRACTOR or its Affiliate, and/or to suspend SUBCONTRACTOR's execution of the Services or work hereunder for security, health, environmental or safety reasons, at any time without liability.

E. SUBCONTRACTOR shall appoint a competent person as its representative for environmental, health and safety ("SUBCONTRACTOR EHS Representative"), and shall ensure that the SUBCONTRACTOR EHS Representative takes part in safety discussions arranged by CONTRACTOR from time to time.

F. SUBCONTRACTOR shall regularly monitor compliance by SUBCONTRACTOR and SUBCONTRACTOR Representatives with EHS Laws by performing tours of the workplace or site. In due time before a tour, SUBCONTRACTOR shall invite CONTRACTOR to participate. If the SUBCONTRACTOR discovers SUBCONTRACTOR Representative's non-compliance with EHS Laws or the obligations of this Section, it shall restore compliance without undue delay and advise CONTRACTOR in writing of the status of the SUBCONTRACTOR's corrective actions.

G. Upon CONTRACTOR request, SUBCONTRACTOR shall promptly (a) provide documentation that SUBCONTRACTOR and SUBCONTRACTOR Representatives have met the requirements of EHS Laws; and (b) grant CONTRACTOR or its agents access to all documents, in any form, related to health, environment, and safety in connection with the Services or any work performed under this Agreement.

H. SUBCONTRACTOR shall immediately notify CONTRACTOR of any incident involving death, injury or damage to any person or property occurring in connection with the Services or work hereunder. In case of an incident leading to (a) a person's death or injury involving more than one day of incapacity of any SUBCONTRACTOR, SUBCONTRACTOR Representative, or employee or subcontractor of CONTRACTOR, or (b) more than three persons being brought to a hospital, SUBCONTRACTOR shall immediately cooperate with CONTRACTOR to (i) conduct a root cause analysis of the incident; (ii) determine appropriate measures for SUBCONTRACTOR to prevent similar incidents in the future (hereinafter "SUBCONTRACTOR Measures") and the time period for implementation by SUBCONTRACTOR; and (iii) when requested by CONTRACTOR, to prepare in whole or in part, a root cause analysis report. SUBCONTRACTOR shall support any investigation conducted by CONTRACTOR or its representative(s).

I. In the event CONTRACTOR produces a safety and health document for the worksite ("EHS Plan"), CONTRACTOR will provide SUBCONTRACTOR with a copy of the EHS Plan. The SUBCONTRACTOR shall confirm receipt thereof in writing and comply with the regulations contained therein. The same shall apply to updates of the EHS Plan which CONTRACTOR may produce as it deems necessary. SUBCONTRACTOR shall inform SUBCONTRACTOR Representatives of the EHS Plan and obtain such representatives' commitment to perform Services and other work under this Agreement in accordance with the EHS Plan as updated.

Document Number: C0S_99_FM005S
Version: 1.1

FORM S-100
S-100 Subcontract Agreement Form
Department: Legal

Published Date: 03/29/2013
Contract Page 15 of 17

# SIEMENS INDUSTRY, INC., BUILDING TECHNOLOGIES DIVISION

Exhibit F – NUMBER

J.  In addition to any other rights in law or equity CONTRACTOR or its affiliates may have, in the event of SUBCONTRACTOR or SUBCONTRACTOR Representatives' failure to comply with the EHS Laws, the terms of this Section, and/or the EHS Plan and its update(s), CONTRACTOR may terminate this Agreement for cause without liability whatsoever (a) immediately should the nature, severity and duration of the failure(s) so warrant, or (b) after providing SUBCONTRACTOR with a notice of termination and opportunity to cure, which period is reasonable considering the nature, severity and duration of the failure(s), and SUBCONTRACTOR's failure to satisfactorily cure. SUBCONTRACTOR shall be liable to CONTRACTOR and its Affiliate(s) for any costs incurred by CONTRACTOR or its affiliate(s) for failure to comply with any EHS Law(s), this Section, or the EHS Plan as updated.

K.  By entering into this Agreement, SUBCONTRACTOR agrees that it has examined the worksite for the performance of Service or other work hereunder, in order to acquaint itself with the local conditions including any regulations governing admission to the site, safety and/or security.

Document Number: C05_99_FM0055
Version: 1.1

FORM S-100
S-100 Subcontract Agreement Form
Department: Legal

Published Date: 03/29/2013
Contract Page 16 of 17

# Exhibit A

SUBCONTRACTOR understands that the contract outlines the general scope of the Work only and as such, does not necessarily indicate or describe all work required for the full performance and completion of the project. SUBCONTRACTOR shall furnish and install all items necessary to complete a properly functioning, CITY approved project without adjustment to the contract/subcontract price. SUBCONTRACTOR represents that it is skilled and expert in its trade and acknowledges that CONTRACTOR is relying upon SUBCONTRACTOR's skill and expertise in the planning, design and implementation of the Work described below.

Subcontractor will provide parts, repairs, and upgrades to the J.H. Fewell Water Treatment Plant (WTP) as follows:

- $840,153.00: Chemical Feed Repairs:
    - Inspection and replacement of existing motor, switchover valve, ammoniators, chlorinators, chlorine injector, chemical feed pumps, CL2 analyzers and associated piping;
    - Provide up to six (6) on-site visits (not to exceed 8 hours each) to calibrate and adjust the system to ensure proper operation;
    - Replace existing Sabre manual chlorine dioxide generator and feed system with similar type, size, and capacity unit.

- $269,037.00: Provide quarterly service/maintenance labor for twenty-four (24) months during the Construction Period for Trojan ultraviolet system as follows:
    - Forty (40) hours on-site per quarterly visit to perform inspection and service of the system;
    - Thirty-two (32) hours of emergency service with 48-hour response time.
    - 24/7 telephone technical support;
    - Report to the Mississippi Department of Environmental Quality (MDEQ);
- $145,000.00: Provide up to twenty-four months of service during the Construction Period for the Controls Systems, Inc. controls system as follows
    - Limited to 400 total hours per year between the hours of 7:00 AM to 4:30 PM CST, Monday thru Friday;
    - Two (2) hour response time during the hours defined above;
- $652,750.00: Recoat Elaine water storage tank as follows:
    - Remove existing coatings;
    - Apply one (1) coat of zinc clad coating;
    - Apply one (1) coat of protective epoxy coating:
    - Apply one (1) coat of high gloss, polyurethane sealer;
    - Application of CLIENT's logo is included;
    - Exclusion: No tank repairs are included.
- $95,950.00: Replace Clearwell Pump #2:
    - Worthington vertical turbine pump with 16MF mixed flow, water flush lubrication, 1175RPM, 73' TDH.
- $187,038.00: Removal and replacement of filter media for Filter #11 to include grouting as required and factory authorized inspection:
- $6,000.00: Replace main doors at Windsor Booster Station as follows:
    - Replace two (2) 3' X 6' 8" metal doors;
    - Repair block;
    - Paint to match building;
- $108,925.00: Replace roof on fluoride building:
    - Remove existing coal tar roof to structural concrete;

- <u>$14,174.00</u>: High Service Pump #2:
  - o   Replace expansion joint;
- <u>$27,135.00</u>: High Service Pump #5:
  - o   Replace relief valve;
  - o   Replace two (2) start solenoids;
  - o   Replace motor guards;
  - o   Replace vibration sensor;
- <u>$12,961.00</u>: Backwash Pump #2:
  - o   Replace vibration sensor;
  - o   Replace two (2) motor guards;
- <u>$18,650.00</u>: High Service Pump #10:
  - o   Replace vibration sensor;
  - o   Replace two (2) motor guards;
- <u>$3,357.00</u>: Install 0-8 MGD Rosemont indicator on flow meter for Filter #3:
- <u>$2,238.00</u>: Install alternating board for filter gallery sump pumps:
- <u>$12,122.00</u>: Replace #2 spray wash valve on raw water screen:
- Install sixteen (16) 624U Watson Marlow (or similar) two-headed diaphragm pumps for lime, ACH, polymer, and caustic and install new controls in chemical feed building: <u>$41,975.00</u>
- <u>$6,994.00</u>: Replace one (1) 3 HP, 3,450 RPM raw water pump for membrane pilot plant:
- <u>$5,410.00</u>: Fabricate and install covers for membrane building air compressors:
- Inspect and perform miscellaneous repairs for all ph and turbidimeters as needed: <u>$6,500.00</u>
- <u>$7,833.00</u>: Install new remote controls board for Membrane Rapid Mix Basin #1
- <u>$7,833.00</u>: Install new remote controls board for Membrane Rapid Mix Basin #2:
- <u>$13,428.00</u>: Provide parts to repair sluice gate motor on Train #1:
- <u>$7,460.00</u>: Provide parts to replace reject actuator and solenoid in membrane building:
- <u>$8,100.00</u>: Repair temperature meter on membrane tanks:
- <u>$20,981.00</u>: Replace all collapsed hoses in membrane recovery feed system:
- <u>$13,521.00</u>: Install two (2) new backup 2 HP sump pumps in chemical building:
- <u>$3,636.00</u>: High Service Pump #1:
  - o   Replace motor guards;
- <u>$197,335.00</u>: High Service Pump #8:
  - o   Replace bearings;
  - o   Repair pump and 800 HP motor;
- <u>$43,641.00</u>: Replace twenty-four inch (24") High Service Pump #1 flow meter:
- <u>$222,300.00</u>: Design and install gate valve to separate the two rapid mixers as follows:
  - o   Cut and demolish existing asphalt;
  - o   Install new forty-two inch (42") gate valve in existing pre-stressed pipe to include all fitting and evacuation shoring;
  - o   Backfill and repair asphalt;
- <u>$51,287.00</u>: Replace one (1) Philadelphia 15 HP back up mixer (or similar):
- <u>$43,641.00</u>: Replace twenty-four inch (24") High Service Pump #2 flow meter:
- <u>$3,636.00</u>: Replace float for filter gallery sump pump:
- <u>$312,387.00</u>: Repair two (2) 150 HP raw water pumps and motors and replace drives:
- <u>$14,826.00</u>: Miscellaneous SCADA additions:
  - o   Read pH from SCADA system;
  - o   Program temperature display and trend output for raw water, high service water, and first tap;
- <u>$ 287,210.00</u>: Inspect and clean out raw water line from intake to plant:
  - o   Inspection and cleaning will be performed over a thirty (30) day period by professional divers to include clam removal;
  - o   Before and after video will be provided;
- <u>$13,987.00</u>: Raw Water Pump #2 :

- o   Adhere 1/8" tapered system with approved adhesive;
- o   Adhere 1/4" sopraboard with approved adhesive;
- o   Cold apply or heat weld modified bitumen base sheet;
- o   Cold apply or heat weld modified bitumen cap sheet;
- o   All edge metal to be removed and replaced with 0.040" aluminum;
- $130,000.00: Repair Filters #17, #18, #19, #21, #22, and #26;
- $5,000.00: Replace check valve on pump #3;
- $40,000.00: Replace gate valve in clearwell;

Subcontractor will provide parts, repairs and upgrades to the O.B. Curtis WTP as follows:

- $269,037.00: Provide quarterly service/maintenance labor for twenty-four (24) months during the Construction Period for Trojan ultraviolet system as follows:
  - o   Forty (40) hours on-site per quarterly visit to perform inspection and service of the system;
  - o   Thirty-two (32) hours of emergency service with 48 hour response time;
  - o   24/7 telephone technical support;
- $80,109.00: Replace raw water and pre-oxidation perimeter lights with similar materials:
  - o   Run signal wire in conduit for front-end turbidimeter for sedimentation basins to junction box at pre-treatment structure;
  - o   Replace door on walk-in HV switch gear;
- $175,310.00: Install two (2) 2' x 6' sluice gates with grating modifications as needed to original rapid mix for isolation during maintenance;
- $377,750.00: Repair and recoat Dryvit building exterior finishes as follows:
  - o   Clean Dryvit on sludge building;
  - o   Clean Dryvit, patch cracks and holes, and repair cornice on east side of chemical feed building;
  - o   Clean coating on concrete, patch cracks and holes where coating delaminated at influent pump station;
  - o   Clean coating on concrete, patch cracks and holes in DryVit and coating on membrane building;
  - o   Clean DryVit, clean coating on concrete, patch cracks and holes in DryVit and coating on filter building;
  - o   Clean DryVit, recoat DryVit at sides and rear, recoat Dryvit to wainscot band on front of administration/lab building;
  - o   Clean coating on concrete foundation of high service pump building;
  - o   Clean coating on concrete, patch cracks and holes where coating has delaminated on pre-oxidation basin;
- $906,400.00: Inspect and repair/replace four (4) 60 HP raw water pumps and associated variable frequency drives;
- $113,765.00: Replace sludge plant roof as follows:
  - o   Install furring over existing shingle roof;
  - o   Install metal roof with exposed fasteners;
  - o   Color to match existing building;
- $368,250.00: Replace existing 6,000 CFM dehumidification unit with new Bry-Air (or similar) packaged dehumidification system to include:
  - o   Control panel;
  - o   Rotor drive assembly;
  - o   Outlet dampers;
  - o   Structural skid mounted;
  - o   Pre-wired with disconnect switch;
- $7,273.00: Replace motor guards on High Service Pump #3 & 4;
- $12,961.00: Backwash Pump #11
  - o   Replace two (2) motor guards;
  - o   Replace vibration sensor;

- o  Replace pressure switch;
- o  Replace solenoid valve;
- o  Inspect/Repair plumbing;
- $13,402.00: Testing of the backup Nissan meter with results to be provided to the CLIENT;
- $11,345.00: Correct discrepancy between particle counter and computer display for Train #3;
- $9,658.00: Repair finished water pressure meter in High Service Bay #2;
- $ 103,694.00: Repair Centrifuge #1 as follows:
  - o  Remove and ship to repair facility;
  - o  Disassemble, clean and inspect rotating assembly including gearbox;
  - o  Repair register fits for solid and liquid bowl hubs;
  - o  Repair feed zone liner and accelerator and replace surface erosion protection;
  - o  Replace conveyor tiles as required;
  - o  Dynamically balance bowl and conveyor to ISO G1.0 tolerance;
  - o  Assemble conveyor with new bearings, seal and o-rings;
  - o  Assemble bowl hubs with new bearings, seal and o-rings;
  - o  Assemble gearbox with new bearings, seals and o-rings;
  - o  Replace rotor fasteners as required and paint bearing housings;
  - o  Perform four (4) hours function test;
  - o  Record vibration and bearing temperature readings;
  - o  Return shipping to CLIENT and re-install;
- $267,273: During the Construction Period, provide twenty-four (24) months of service, training, and monitoring for membrane ultra filtration equipment to include:
  - o  Automated data collection and web-accessible, graphical reporting;
  - o  Bi-weekly review of data and communication of issues to CLIENT;
  - o  Provide a semi-annual management report with analysis of key trends and recommendations to improve plant operation, membrane cleaning and overall performance;
  - o  24/7 emergency telephone technical support;
  - o  Three (3) site visits by a factory service representative for five (5) days or forty (40) hours, commencing 8:00 AM on a Monday until this time has elapsed.
- $23,000.00: Replace six (6) plant computers to be used for maintenance supervisor, chemist, sludge building, plant engineer, HMI client, and HMI Historian;
- $20,000.00: Replace pump #4 and auxiliary boards in carbon room;
- $16,500.00: Repair membrane color analyzer;
- $6,500.00: Replace transfer pump for Membrane Manganese Analyzer;
- $3,000.00: Replace membrane air inlet valve;
- $2,800.00: Replace reject valve for train #1;
- $3,700.00: Repair fan on southeast compressor unit on membrane building roof;
- $3,213.00: Install HMI for Moryno pumps in discharge plant;
- $15,000.00: Replace chlorine dioxide system;
- $5,300.00: Replace drives for polymer gravity thickener;
- $6,000.00: Provide programming for GT Pumps computer;
- $88,129.00: Repair conventional filter surface wash system;
- $295,000.00: Replace all eighteen (18) valves on the clarivac system;
- $42,000.00: Repair Moryno pump #2.

Subcontractor will provide sewer collection line repairs at the below locations. This includes labor and material for a complete line repair as described. Asphalt repairs, erosion control, bypass pumping, select fill, traffic control, permits, and fence removal/replacement are included on an as-needed basis.

- $873,000.00: Wilshire Avenue
  - o  Remove and replace 600 linear feet of twenty-one inch (21") sewer line;
  - o  Remove and replace 400 linear feet of eighteen inch (18") sewer line;

- o  Includes three (3) manholes;
- o  Includes one (1) stream crossing;
- $720,000.00: 300 Block of Rollingwood Drive
  - o  Remove and replace 1,140 linear feet of eight inch (8") and ten inch (10") sewer line;
  - o  Includes four (4) manholes;
  - o  Includes one (1) stream crossing;
- $220,000.00: 2704 Quail Run at Eastover
  - o  Remove and replace 320 linear feet of twelve inch (12") sewer line;
- $473,000.00: 2115 Robin Drive
  - o  Remove and replace 1,125 linear feet of twelve inch (12") sewer line;
  - o  Includes six (6) manholes;
- $271,000.00: 220 Dixon Road to I-220
  - o  Remove and replace 1,200 linear feet of twelve inch (12") sewer line;
  - o  Includes three (3) manholes;
- $231,000.00: East Northside Drive
  - o  Relocate 500 linear feet of sewer line from side of street to middle of street from Eastwood Road to Culleywood Drive;
  - o  Includes two (2) manholes;
- $418,500.00: Pearl Street
  - o  Remove and replace 260 linear feet of eight inch (8") sewer line;
  - o  Includes two (2) manholes;
- $417,000.00: 2234 West Highway 80
  - o  Repair of thirty inch (30") sewer line from Lynch Creek interceptor at Hattiesburg Street going west to the north turn of line;
- $1,247,000.00: McClure Road at Meadow Lane
  - o  Replace 2,250 linear feet of fifteen inch (15") sewer line;
  - o  Replace ten inch (10") sewer line with a fifteen inch (15") sewer line from intersection of Meadow Lane and Wildwood Terrace to South Sunset Terrace;
- $194,600.00: 3838 Eastover Drive to 3900 Eastover Drive
  - o  Replace six inch (6") sewer line with eight inch (8") sewer line;
  - o  Includes five (5) manholes;
- $430,000.00: Beasley Road to Meadow Road
  - o  Repair of thirty inch (30") sewer line;
  - o  Includes two (2) stream crossings and lining of pipe;
- $150,000.00: 2212 Heritage Hill Drive
  - o  Remove and replace 400 linear feet of eight inch (8") sewer line;
  - o  Includes one (1) manhole;
- $263,000.00: 5044 Wayneland Drive
  - o  Removal of 700 linear feet of six inch (6") sewer line;
  - o  Replace six inch (6") sewer line with eight inch (8") sewer line;
  - o  Includes two (2) manholes;
- $1,875,000.00: South Drive/ Galvez Street to Jayne Avenue
  - o  Remove and replace 2,300 linear feet of twenty-one inch (21") sewer line;
  - o  Includes six (6) manholes;
  - o  Includes two (2) stream crossings;
- $213,000.00: Liberty Street to Coleman Avenue
  - o  Remove and replace 60 linear feet of fifteen inch (15") sewer line;
  - o  Includes one (1) stream crossing.
- $425,000.00: 1500 Block of Sheffield Drive
  - o  Repair 8" Sewer Line Collapse
- $1,000,000.00: Allowance for future work

In addition to the above, the Subcontractor shall provide all labor required to install the large and residential meters on the project. Subcontractor will also install new lids on all existing residential meters. The mi-node or similar reporting device will be installed on a bottom of the new lids by way of a clip on bracket that will be furnished loose with the lids for installation by subcontractor.

The subcontractor will have all large meters installed within 365 calendar days of delivery by the meter supplier of the meters to the designated warehouse location.

The subcontractor recognizes that the installation of the residential meters is critical to completing the project in a timely manner. As such, within 6 weeks of commencement of work the subcontractor shall provide sufficient skilled labor to average a minimum of 1000 meters per week regardless of the encountered weather conditions. The contractor must at commencement of work for the first six weeks average a minimum of 500 meters per week. Installation is to include all items associated with the meter installation and within 2 feet of the existing meter location

The total number and sizes of meters to be installed is:

| Qty | Description |
| --- | --- |
| 59,936 | 5/8" x 1/2" PD RDM Meter Replacement with Mi.Node (or similar) |
| 2,409 | 1" PD Meter Replacement with Mi.Node (or similar) |
| 517 | 1.5" PD Meter Replacement with Mi.Node (or similar) |
| 1,552 | 2" PD Meter Replacement with Mi.Node (or similar) |
| 490 | 4" Mag Meter Replacement with external battery |
| 82 | 6" Mag Meter Replacement with external battery |
| 6 | 8" Mag Meter Replacement with external battery |
| 3 | 10" Mag Meter Replacement with external battery |
| 3 | 12" Mag Meter Replacement with external battery |
| 64404 | Lids for existing meter boxes |

Subcontractor will take great care to install only the meters listed on the City of Jackson's active meter list. Any rework required for failure to comply with this requirement is solely the responsibility of this subcontractor.